983 F.2d 1070
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Marcus Lacey, Defendant-Appellant.
 No. 92-1186.
 United States Court of Appeals, Sixth Circuit.
 Jan. 5, 1993.
 
 Before MILBURN and BATCHELDER, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant Marcus Lacey appeals from the district court's denial of his pretrial motion to dismiss the indictment in this case, the Fifth Superseding Indictment ("FSI"), as a violation of the Fifth Amendment's double jeopardy clause. On appeal, the sole issue is whether the district court erred in refusing to dismiss the FSI on double jeopardy grounds. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 Previously, defendant Lacey was convicted of three of four counts contained in an indictment filed against him on May 25, 1989. The indictment charged defendant with involvement in a conspiracy to possess cocaine with intent to distribute cocaine and to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846.
 
 That indictment stated in relevant part:
 Count One
 
 3
 ... from on or about May 1, 1989 through May 2, 1989, in ... Detroit and elsewhere, CHARLES ANTONIO THOMAS, ZOTIS HARRIS aka George Michaels, and MARCUS LACEY, aka Mark Mamon, defendants did knowingly, intentionally and unlawfully combine, conspire, confederate and agree with each other and with various other persons whose names are both known and unknown ... to knowingly, intentionally and unlawfully possess with intent to distribute and to distribute cocaine, more specifically 500 or more grams of a substance containing a detectable amount of cocaine, a Schedule II Controlled Substance....
 
 
 4
 It was part of the unlawful conspiracy that CHARLES ANTONIO THOMAS on May 1, 1989 negotiated the sale of two kilograms of cocaine for a price of $17,500 for each kilogram. On May 2, 1989, in Detroit, Michigan CHARLES ANTONIO THOMAS and ZOTIS HARRIS, ... did distribute one kilogram of cocaine for $17,000 to the potential purchaser, who proved to be an under cover agent of the Federal Bureau of Investigations (FBI). It was further part of the unlawful conspiracy that on May 2, 1989, ... MARCUS LACEY, ... acted as "look-out" and provided security for the conspiracy.
 
 
 5
 J.A. pp. 8-9.
 
 
 6
 Thus, the charges in the initial indictment arose following a May 2, 1989, "buy/bust" at defendant's Detroit, Michigan, home, and the period of criminality alleged in the initial indictment was from May 1 through May 2, 1989. Further, the events leading to defendant's prior arrest, indictment, and conviction are briefly summarized.
 
 
 7
 On April 28, 1989, Cleveland, Ohio, police arrested Eugene Dickerson on cocaine distribution charges. He told the Cleveland police that he was from Detroit, and he brought the cocaine to Cleveland because the price for the cocaine was higher there. Dickerson agreed to cooperate with the Cleveland police who notified the Cleveland office of the Federal Bureau of Investigation ("FBI").
 
 
 8
 On May 1, 1989, FBI special agent Kenneth Riolo had Dickerson place a monitored call to Charles Antonio Thomas, a/k/a "Big Tony" or "Tone," to set up a "buy/bust" for two kilos of cocaine in Detroit. Dickerson told Big Tony that he was the middleman for a man from New Orleans, actually an FBI undercover agent. It was agreed that the "deal" would take place the following day in Detroit.
 
 
 9
 On May 2, 1989, Dickerson and the undercover FBI agent went to the home of defendant, a/k/a "Mark Mamon," in Detroit. Defendant's home was placed under surveillance by a number of FBI agents. The transaction was tape recorded. During the transaction, defendant acted as the doorman and lookout and carried a gun. The participants in the transaction, including defendant, were arrested at the scene.
 
 
 10
 Defendant Lacey pled guilty to the charges in the initial indictment and was sentenced to 97 months imprisonment on October 17, 1989. Defendant did not cooperate with the police or the FBI following either his arrest or conviction.
 
 B.
 
 11
 Subsequently, in July 1991, defendant Lacey was indicted in this case. Count one of the FSI, the instant indictment, charges defendant with conspiracy to possess with intent to distribute and to distribute cocaine, cocaine base, and marijuana in violation of 21 U.S.C. § 846.
 
 The FSI states in relevant part:
 COUNT ONE
 
 12
 ... from in or about June, 1987 and continuing thereafter up to and including March 29, 1991, ... WILLIAM SABRA, JUAN CERNA, MARCUS DAVID CERNA, BENJAMIN L. GILES, JR., (a/k/a SMITTY), MARCUS LACEY, SALVADOR VILLANEUVA, OSCAR MENDEZ, KENNETH HIGH, DUANE MOORE, FRANK BUFKIN, DONNIE RIGGS, ANDREW SAWYER, JR., TERRANCE JACKSON (a/k/a "Terrance Caldwell and "Teddy") and DINO HOWARD, ... did knowingly, intentionally and unlawfully combine, conspire, confederate and agree with one another ... to commit an offense against the United States, that is, to possess with intent to distribute and to distribute controlled substances, including cocaine and cocaine base, Schedule II Controlled Substances, and marijuana, a Schedule I Controlled Substance ...
 
 
 13
 It was part of the ways and means of the unlawful conspiracy that WILLIAM SABRA, JUAN CERNA, MARCUS DAVID CERNA, and BENJAMIN L. GILES, JR. ... along with other co-conspirators, including Darryl Thomas and Leroy Johnson, would obtain controlled substances in the Houston area and transport the controlled substances from Houston, Texas, to the Eastern District of Michigan, where they would distribute the controlled substances and then return to Houston, Texas with the drug proceeds....
 
 
 14
 J.A. pp. 18-19.
 
 
 15
 Thus, the period of criminality covered in the FSI was from June 1987 through March 29, 1991. The FSI resulted from an extensive Drug Enforcement Agency ("DEA") investigation which, over a two-year period, pieced together an elaborate drug network along an axis running from Houston, Texas, to Detroit, Michigan. Fourteen defendants are named in the FSI. The conspiracy in the FSI involved the transportation of cocaine from Texas. More than 800 kilograms of cocaine were distributed by the conspirators.
 
 
 16
 Defendant Lacey filed a pretrial motion for dismissal of the FSI alleging that the FSI violated the double jeopardy clause of the Fifth Amendment because it was based upon exactly the same criminality, viz., conspiracy to distribute cocaine, to which he had previously pled guilty. An evidentiary hearing on this issue was held by the district court on December 10, 1991.
 
 
 17
 Two witnesses testified at the evidentiary hearing, DEA Agent Brian Halton and FBI Agent Robert Carter. DEA Agent Halton was called by the defense. Agent Halton testified that the starting point of his investigation occurred at the Detroit City Airport on April 7, 1989. Agent Halton, who had "airport duty" that day, noticed a woman struggling toward a cab which she was sharing with a male passenger from her flight from Houston. Agent Halton talked to the pair who identified themselves as the "Reids," but he did not know if they were brother and sister or husband and wife. The "Reids" agreed to leave their suitcases so that a search warrant could be obtained, but they departed the scene in the cab. The subsequent search of the suitcases revealed 78 pounds of marijuana. Subsequently, Agent Halton discovered the true identity of Mr. "Reid" to be William Sabra.
 
 
 18
 On April 17, 1989, Linden, Texas, police stopped a vehicle occupied by William Sabra and Lisa Yeary. The vehicle contained 31 kilograms of cocaine. Both Sabra and Yeary were arrested.
 
 
 19
 Lisa Yeary decided to cooperate with the DEA. She told Agent Halton that she was a drug courier between Houston and Detroit for a man in Houston, whom she could only identify as "Frenchy." Based upon this information, the government obtained the original indictment in this case on July 6, 1989. Six defendants were named in the original indictment: William Sabra, Stacia Grear, Carliss Bradford, Stacy Brown, "Frenchy," and Donna Woods. No trial was held on this indictment because William Sabra fled and became a fugitive.
 
 
 20
 On June 26, 1989, Agent Halton was again working at the Detroit City Airport. He encountered a man flying to Houston who produced identification indicating he was Steven Dwayne Richards and that he lived at 6319 Ludington, Houston, Texas. This was the same address which William Sabra had on his identification. Halton photocopied Richards's identification. Halton showed the photocopy to Yeary, who identified the man as "Jack," a member of "Frenchy's" drug organization.
 
 
 21
 Through telephone toll records, Agent Halton discovered that a mobile phone in Houston in the name of Steven Dwayne Richards was frequently used to call a Detroit telephone number in the name of Kevin Jackson. Agent Halton obtained a photograph of Kevin Jackson and recognized the person in the photograph as the same individual who had identified himself as Steven Dwayne Richards.
 
 
 22
 Agent Halton also obtained Kevin Jackson's arrest records which indicated that he was associated with a Darryl Thomas. Agent Halton then obtained a photograph of Darryl Thomas. Subsequently, on December 1, 1989, the individual in the photograph was identified as being "Frenchy."
 
 
 23
 Trial on the original indictment in this matter was rescheduled for February 20, 1990. However, on that date, the trial was indefinitely postponed because Lisa Yeary had been seriously injured in an automobile accident, and defense counsel requested that the trial be adjourned until she was physically able to appear at the trial. Thereafter, on April 17, 1990, and May 22, 1990, superseding indictments were returned in this matter.
 
 
 24
 In June 1990, Darryl Thomas was arrested in Nevada. He was returned to Detroit for trial, based upon the third superseding indictment, which was scheduled for October 3, 1990. After the trial date was scheduled, some of the defendants, particularly Darryl Thomas and Leroy Johnson, began cooperating with the government. They provided information that an individual known as "Diamond" or "Diamond Mark" had been one of the persons receiving multi-kilogram quantities of cocaine in Detroit from their organization. They identified "Diamond" as a partner of "Freddie Kruger," subsequently identified as Duane Moore. Darryl Thomas also identified Charles Antonio Thomas as his nephew.
 
 
 25
 On December 6, 1990, Leroy Johnson identified a photograph of defendant as "Diamond." Based upon this information, the FSI was issued by the grand jury on July 2, 1991.
 
 
 26
 At the hearing on defendant Lacey's motion to dismiss, DEA Agent Halton testified that the conspiracy which forms the basis for the FSI was headed by Juan Cerna, Darryl Thomas, Leroy Johnson, and Duane Moore. It was the government's theory that defendant was the associate/partner of Duane Moore in the conspiracy. According to Agent Halton, the distribution network of the conspiracy in Michigan involved shipment of the cocaine by Darryl Thomas to Duane Moore, defendant's alleged associate/partner. Some of the cocaine was then distributed through Duane Moore to defendant. Agent Halton estimated that from the end of 1988 to the beginning of the summer of 1989, 450 kilograms of cocaine were distributed to Duane Moore, and through him, at least in part, to the defendant. Agent Halton testified that defendant and Duane Moore often received the cocaine in quantities of ten, fifteen, or twenty kilograms.
 
 
 27
 On January 29, 1992, the district court issued a memorandum opinion and order denying defendant's motion to dismiss. In its opinion and order, the district court found that defendant had met his initial burden of production of demonstrating a nonfrivolous claim of double jeopardy. However, the district court also found that in light of the Supreme Court's decision in Grady v. Corbin, 110 S.Ct. 2084 (1990), and the factors set forth by this court in United States v. Sinito, 723 F.2d 1250, 1256 (6th Cir.1983), cert. denied, 469 U.S. 817 (1984), the government had shown by a preponderance of the evidence that the two alleged conspiracies were separate and distinct agreements. The district court concluded with a holding "that the present charge relates to a sufficiently distinct set of circumstances so as to compel the conclusion that the government is not seeking to prosecute defendant for the 'same conduct.' " Thus, the government was allowed to proceed against defendant Lacey on the charges in the FSI. Defendant Lacey then filed a timely interlocutory appeal pursuant to the Supreme Court's opinion in Abney v. United States, 431 U.S. 651 (1977).
 
 A.
 
 28
 Defendant Lacey argues that the district court erred in refusing to dismiss the FSI on double jeopardy grounds. He contends that the two conspiracies are one and the same, that is, that the May 1989 conspiracy to which he pled guilty is part of the larger conspiracy alleged in the FSI. Consequently, he asserts that the second conspiracy prosecution, the FSI prosecution, is barred by the double jeopardy clause of the Fifth Amendment to the Constitution of the United States.
 
 
 29
 The double jeopardy clause of the Fifth Amendment prohibits multiple prosecutions for the same offense. If the conspiracy charged in this case and the conspiracy to which defendant pled guilty in May 1989 were both part of a single agreement, the FSI is barred and must be dismissed. See Braverman v. United States, 317 U.S. 49, 54 (1942). Generally, the burden is on the defendant to show that a single conspiracy exists, but, because the government typically has better access to evidence, that burden is satisfied if the defendant advances a nonfrivolous or prima facie showing of a single conspiracy. See United States v. Jabara, 644 F.2d 574, 576-77 (6th Cir.1981). At that point, the burden shifts to the government to show separate conspiracies by a preponderance of the evidence. United States v. Adamo, 742 F.2d 927, 947 (6th Cir.1984), cert. denied, 469 U.S. 1193 (1985); Jabara, 644 F.2d at 576.
 
 
 30
 Until recently, a double jeopardy claim raised by an accused as a bar to a subsequent prosecution was analyzed under the test articulated by the Supreme Court in Blockburger v. United States, 284 U.S. 299 (1932). The Court in Blockburger held that "the test to be applied to determine whether there are two offenses or only one [for purposes of double jeopardy] is whether each provision requires proof of an additional fact which the other does not." Id. at 304.
 
 
 31
 However, in Grady v. Corbin, 110 S.Ct. 2084 (1990), the Supreme Court broadened the double jeopardy analysis for subsequent prosecution cases. The first step of the Grady analysis utilizes the Blockburger test. "To determine whether a subsequent prosecution is barred by the Double Jeopardy Clause, a court must first apply the traditional Blockburger test. If the application of that test reveals that the offenses have identical statutory elements or that one is a lesser included offense of the other, the inquiry must cease, and the subsequent prosecution is barred." 110 S.Ct. at 2090. However, a subsequent prosecution must do more than merely survive the Blockburger test. 110 S.Ct. at 2093. The second step of the Grady analysis dictates that the double jeopardy clause also bars a subsequent prosecution if, in order to establish an essential element of an offense charged in the subsequent prosecution, the government will prove conduct which constitutes an offense for which the defendant has already been prosecuted. Id. The critical analysis in this step of the Grady analysis is what conduct the government will prove, not what evidence the government will use to prove that conduct. Id. The presentation of specific evidence in one trial does not forever prevent the government from introducing that same evidence in a subsequent proceeding. Id. Thus, in essence, the second step of the Grady analysis provides that a criminal defendant may not be prosecuted in a subsequent proceeding for an offense which incorporates as part of its essential elements all the same conduct of the offense charged in the first prosecution. See United States v. Easley, 942 F.2d 405, 408 (6th Cir.1991).
 
 
 32
 Recently, the Supreme Court revisited the double jeopardy issue in United States v. Felix, 112 S.Ct. 1377 (1992). In Felix, the Court stated:
 
 
 33
 There [in Grady] we said that the Double Jeopardy Clause bars a prosecution where the Government, "to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted." 495 U.S. at 521, 110 S.Ct. at 2093. Taken out of context, and read literally, this language supports the defense of double jeopardy. But we decline to read the language so expansively, because of the context in which Grady arose and because of difficulties which have already arisen in its interpretation.
 
 
 34
 Id. at 1383-84. The Supreme Court further cautioned against "ready transposition of the 'lesser included offense' principles of double jeopardy ... to multilayered conduct...." Id. at 1385, (citations omitted). The Court further stated that
 
 
 35
 [t]he great majority of conspiracy prosecutions involve ... allegations of multilayered conduct as to time and place; .... Reliance on the lesser included offense analysis, however useful in the context of a "single course of conduct," is therefore much less helpful in analyzing subsequent conspiracy prosecutions....
 
 Id, (citations omitted.)
 
 36
 Because of the peculiar characteristics of the offense of conspiracy, which involves an agreement to commit unlawful acts that may continue for an extended period of time and involves the commission of numerous criminal offenses, the courts have adopted a multi-pronged "totality of the circumstances" test to determine whether two successive conspiracy indictments charge the "same offense" within the meaning of the double jeopardy clause. See United States v. Ragins, 840 F.2d 1184, 1188 (4th Cir.1988); United States v. MacDougall, 790 F.2d 1135, 1144 (4th Cir.1986). In conspiracy prosecutions, the multiple/single conspiracy issue is determined by applying a "totality of the circumstances" test rather than the more limited "same evidence" test normally applied to double jeopardy reviews of substantive offenses. Sinito, 723 F.2d at 1256; Jabara, 644 F.2d at 577.
 
 
 37
 The "totality of the circumstances" test requires the trial court to consider the elements of (1) time, (2) persons acting as co-conspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offenses charged which indicates the nature and scope of the activity which the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place. United States v. McHan, 966 F.2d 134, 137 (4th Cir.1992); United States v. Benton, 852 F.2d 1456, 1462 (6th Cir.), cert. denied, 488 U.S. 993 (1988); Sinito, 723 F.2d at 1256. Where several of these factors differ between the conspiracies, the conclusion follows that the alleged illegal conspiracies are separate and distinct offenses. Benton, 852 F.2d at 1462.
 
 
 38
 Thus, the ultimate question is whether the evidence shows one agreement or more than one agreement. Further, the district court's finding that the government has proven by a preponderance of the evidence that multiple conspiracies existed will not be set aside by this court on appeal unless the finding is clearly erroneous. Jabara, 644 F.2d at 577. This court will accept the district court's finding unless it "is left with the definite and firm conviction that a mistake has been committed." See In re Grand Jury Proceedings, 797 F.2d 1377, 1381 (6th Cir.1986), cert. denied, 479 U.S. 1031 (1987).
 
 
 39
 The first Sinito factor is time. The initial indictment indicates the time frame of the conspiracy was May 1 to May 2, 1989. The FSI covers the period from June 1987 to March 29, 1991. Therefore, the FSI overlaps and subsumes the time period in the initial indictment. However, this is not conclusive evidence of a single conspiracy. In United States v. Inmon, 594 F.2d 352 (3d Cir.1979) (per curiam), cert. denied, 444 U.S. 859 (1979), there was a ten-month overlap in the time periods alleged in the first and second indictments, and all of the criminal activity was alleged to have occurred in the Pittsburgh, Pennsylvania, metropolitan area. The Third Circuit found the existence of two conspiracies and stated that "[t]ime frames and personnel can overlap in separate criminal agreements. In a metropolitan area such as Pittsburgh, it is possible for more than one scheme involving the distribution of heroin to exist." Id. at 354.
 
 
 40
 The second Sinito factor is persons acting as co-conspirators. Defendant is the only individual named in both indictments. However, in cases where there is a considerable overlap of defendants, courts have found no double jeopardy bar. In In re Grand Jury Proceedings, 797 F.2d at 1382, there was a considerable overlap of defendants, yet the court found separate conspiracies. Likewise, in MacDougall, 790 F.2d at 1145, 12 defendants overlapped out of a total of 24 individuals named in the two indictments. Yet, the Fourth Circuit stated that "[i]n view of the enormity of the conspiracies involved and the size of the individual ventures, we are not persuaded that the level of overlap of defendants indicates the existence of a single conspiracy." Given the enormity of the conspiracy as alleged in the FSI, the overlap of a single defendant does not indicate a single conspiracy.
 
 
 41
 The third Sinito factor is the statutory offenses charged. Both indictments charge violations of 21 U.S.C. § 846. However, the initial indictment charged conspiracy to possess with intent to distribute and distribute cocaine while the FSI embraces not only cocaine, but also marijuana.
 
 
 42
 The fourth Sinito factor is a comparison of the overt acts charged by the government. This factor is the most significant factor for courts to consider. In re Grand Jury Proceedings, 797 F.2d at 1383. In this case, the two conspiracies charged against defendant Lacey involve different acts. The first prosecution involved a single "buy/bust" sale of cocaine in Detroit, as a result of negotiations originating in Cleveland. On the other hand, the FSI alleges a large-scale conspiracy, involving mainly the movement of cocaine and marijuana between Houston and Detroit as well as the distribution of the drugs in Detroit.
 
 
 43
 The final Sinito factor is the places where the alleged events took place. The initial indictment involved Cleveland, Ohio, and Detroit, Michigan, with the distribution occurring in Detroit. The FSI involves Houston, Texas, and Detroit, Michigan, again with the distribution in Detroit. Although there is some overlap between the two indictments because the distribution in both was to occur in Detroit, this is not dispositive. As the Third Circuit noted in Inmon, it was not conclusive that the two indictments at issue alleged heroin conspiracies occurring in Pittsburgh, because a metropolitan area that size could well have more than one conspiracy involving heroin in operation at the same time. The same is also true of the Detroit metropolitan area.
 
 
 44
 Based upon the foregoing, the district court's conclusion that the government had met its burden of showing by a preponderance of the evidence that the two indictments did not involve a single conspiracy is not clearly erroneous because a review of the record in light of the Sinito factors does not lead to the definite and firm conviction that a mistake has been made.
 
 B.
 
 45
 Defendant Lacey also argues that the district court erred in finding that even if the May 1989 conspiracy conviction and the conspiracy charge in the FSI were the "same offense" for double jeopardy purposes, the second prosecution would not be barred by double jeopardy because the government could not have discovered the connections between the two prosecutions prior to the completion of the May 1989 prosecution, even with the exercise of due diligence. The Supreme Court recognizes an exception to the double jeopardy bar to prosecuting a greater offense following a conviction or acquittal of a lesser offense if "the facts necessary to the greater were not discovered despite the exercise of due diligence before the first trial." See Jeffers v. United States, 432 U.S. 137, 152 (1977). See also Grady, 110 S.Ct. at 2090 n. 7; Brown v. Ohio, 432 U.S. 161, 169 n. 7 (1977).
 
 
 46
 The facts in this case readily confirm the district court's conclusion that the government could not have learned of defendant's involvement in the FSI conspiracy with due diligence prior to the time he pled guilty to the original conspiracy charges. Despite the efforts of the DEA in investigating the FSI conspiracy, the DEA did not identify defendant as "Diamond" or "Diamond Mark" until December of 1990, approximately 14 months after defendant pled guilty to the conspiracy charges in the original indictment. Further, even a brief review of the facts relating to the FSI conspiracy shows just how complicated the conspiracy was as well as the significant amount of effort required by the government in unraveling the conspiracy.
 
 
 47
 Defendant argues, however, that the government did not exercise due diligence by not dismissing the complaint against him in May of 1989 and in not initiating an investigation to find the source of the cocaine that was sold in the "buy/bust." However, since none of the three defendants in the original conspiracy prosecution cooperated with the government following their arrest, it is difficult to see how the FBI could have developed any information about the source of the cocaine. Further, even assuming arguendo the correctness of defendant's assertion that the cocaine sold in the May 1989 "buy/bust" was obtained through the FSI conspiracy, the FBI developed no information about the source of the cocaine as a result of the arrest of defendant and his two co-conspirators. Rather, the DEA as a result of a separate and ongoing investigation, which did not culminate until 19 months after defendant's arrest in the "buy/bust," developed information about a possible source of the cocaine.
 
 
 48
 Defendant also asserts that since he was prosecuted by the same Assistant United States Attorney, Karl Overman, for both conspiracies, the government should have tied the conspiracies together. However, as discussed above, application of the five-prong Sinito test results in the conclusion that the two conspiracies are separate. Further, it is absurd to suggest that the prosecutor should have linked the two conspiracies together, particularly during the first prosecution, when neither the FBI nor the DEA had any information upon which even a theoretical linkage of the conspiracies could have been predicated.
 
 
 49
 Therefore, the district court's finding that double jeopardy would not bar the FSI prosecution because the information leading to the charges against defendant in the FSI could not have been discovered by the government, even with the exercise of due diligence prior to his initial conviction, is not clearly erroneous.
 
 III.
 
 50
 For the reasons stated, the district court is AFFIRMED.