53 F.3d 332
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Marcus LACEY, Defendant-Appellant.
 No. 94-1030.
 United States Court of Appeals, Sixth Circuit.
 May 2, 1995.
 
 Before: MILBURN, RYAN, and GODBOLD,* Circuit Judges.
 MILBURN, Circuit Judge.
 
 
 1
 Defendant Marcus Lacey appeals his conviction and sentence for conspiracy to possess with intent to distribute and to distribute cocaine, cocaine base, and marijuana in violation of 21 U.S.C. Secs. 841(a)(1) and 846. On appeal, the issues are (1) whether the district court lacked jurisdiction to try defendant because the Fifth Superseding Indictment, which first named defendant as a party to this action, was issued after the expiration of the term of service for the grand jury issuing the original indictment, (2) whether the district court erred in refusing to strike testimony by a government witness concerning perceived threats against him as a result of his willingness to testify on the government's behalf, and (3) whether the district court erred in the method by which it ensured that defendant's sentence for this conviction would be run concurrently with defendant's existing federal sentence. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 Defendant Marcus Lacey's conviction relates to his participation in a conspiracy among at least 14 individuals engaged in the acquisition of cocaine, cocaine base, and marijuana in Houston, Texas, and the distribution of the drugs in and around Detroit, Michigan. The indictment resulted from a Drug Enforcement Agency investigation that pieced together the extensive network of co-conspirators moving the drugs between Houston and Detroit over a two-year period. The Fifth Superseding Indictment charges that the conspiracy continued from around June 1987, through March 29, 1991.
 
 
 3
 One of the key participants in the conspiracy was Darryl Thomas, who eventually pled guilty to one count of running a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848 under the Third Superseding Indictment and cooperated with the government as a witness in this case pursuant to a Federal Rule of Criminal Procedure ("Fed. R. Crim. P.") 11 plea agreement. Thomas began selling drugs in the Detroit area around 1985. In approximately 1985 or 1986, Thomas began distributing drugs to wholesale customers, including Duane Moore. In February 1986, the police raided Thomas' nightclub and discovered several kilograms of cocaine in the establishment. As a result of the raid, Thomas was charged with various state law drug offenses. The charges against him were later dropped,[1] however, and Thomas fled to Houston, Texas.
 
 
 4
 In Houston, Thomas teamed up with Leroy Johnson. Using Johnson's connections to acquire the drugs, Thomas began sending pounds of marijuana and kilograms of cocaine from Houston to Detroit. Thomas and his co-conspirators had a small fleet of Rancheros that was used to transport the drugs to Detroit. Eventually, however, Thomas employed women to transport the drugs on commercial airlines. Generally, seven to 10 kilograms of cocaine would travel north with a courier, following which the proceeds from the sale of the cocaine travelled south to Houston.
 
 
 5
 Donna Woods began as a courier for the operation, but she was later used to make flight arrangements and other travel plans for the couriers. She was also in charge of the "stash apartments" in Detroit. Once drugs were delivered to an apartment, Woods, following Thomas' instructions, oversaw the distribution of the drugs to wholesale customers. Woods identified defendant Lacey as one of the people who had come to the apartments to purchase cocaine. Like Thomas, Woods testified pursuant to a plea agreement in which she received a lighter sentence in exchange for her cooperation.
 
 
 6
 Moore and Thomas both testified that defendant Lacey was Moore's partner in cocaine distribution activities, meaning the two split their profits. Thomas testified that Moore referred to defendant as his partner, whom Thomas described as his "number one man." J.A. 85. Moore estimated that between 1987 and 1989, he and defendant received approximately 400 kilograms of cocaine from Thomas. Thomas stated that he sent cocaine to Moore and defendant on an average of eight to 10 times a month. In addition, Thomas testified that he had received money from defendant for sales of cocaine. Thomas estimated that, in all, he distributed over 1,000 kilograms of cocaine during the conspiracy.
 
 
 7
 On October 30, 1988, law enforcement officers at the Detroit Metropolitan Airport seized $106,000 stuffed in suitcases and left at the airport by Nancy Woods, the daughter of co-conspirator Donna Woods. Then, on April 7, 1989, law enforcement officers seized 78 pounds of marijuana from co-conspirators Carliss Bradford and William Sabra at the Detroit City Airport. Finally, on April 17, 1989, 31 kilograms of cocaine were seized in northeast Texas from a truck being driven by co-conspirators Lisa Yeary and William Sabra. As a result of these seizures, an indictment was returned in this matter on July 6, 1989.[2]
 
 
 8
 In the meantime, defendant Lacey was arrested by Federal Bureau of Investigations ("FBI") agents during a "buy-bust" in Detroit on May 2, 1989, and was detained pending trial. A four-count indictment was returned against defendant on May 25, 1989, charging him with involvement in a conspiracy to possess cocaine with intent to distribute and to distribute cocaine. Defendant pled guilty to the charges in the indictment and was sentenced to 97 months imprisonment on October 17, 1989.
 
 B.
 
 9
 Defendant Lacey was linked to the drug distribution conspiracy in the Fifth Superseding Indictment returned by a federal grand jury on July 2, 1991. Defendant obtained a severance and filed a motion to dismiss the conspiracy charge on double jeopardy grounds, claiming that the indictment was based on the same criminal conduct, namely conspiracy to distribute cocaine, to which he had already pled guilty. After the district court denied his motion to dismiss on January 29, 1992, he filed an interlocutory appeal with this court. We denied relief on double jeopardy grounds in United States v. Lacey, 983 F.2d 1070, 1993 WL 1292 (6th Cir. Jan. 5, 1993) (per curiam) (unpublished disposition). Defendant also filed a motion to dismiss the indictment as untimely under Fed. R. Crim. P. 6(g). The district court denied this motion in a memorandum opinion and order issued on June 7, 1993.
 
 
 10
 Defendant's trial on the conspiracy charge began on September 21, 1993. The government presented the testimony of Donna Woods, Darryl Thomas and Duane Moore. Each witness testified about his or her personal involvement with defendant in the conspiracy. In addition, Thomas testified on redirect examination by the prosecution that several people had spoken to him about the possible consequences of his agreement to testify on behalf of the government. The district court overruled defendant's objection to this testimony and denied defendant's motion to strike the testimony, although the district court did allow defendant's counsel to conduct further cross examination of Thomas.
 
 
 11
 Defendant was convicted by a jury on September 27, 1993. On December 28, 1993, the district court sentenced defendant to 262 months imprisonment, to be served concurrently with defendant's existing federal drug sentence. Defendant was also sentenced to 10 years of supervised release and fined $50. This timely appeal followed.
 
 II.
 A.
 
 12
 Defendant Lacey argues that the district court lacked jurisdiction to try him because the indictment in which he was named a party to this action, the Fifth Superseding Indictment, was returned by a grand jury acting after the expiration of the term of service for the grand jury that issued the original indictment. We review the district court's denial of defendant's motion to dismiss the indictment for an abuse of discretion. United States v. Overmeyer, 899 F.2d 457, 465 (6th Cir.), cert. denied, 498 U.S. 939 (1990). "Because of the well-accepted principle that grand jury indictments are presumed valid, we exercise extreme caution in dismissing an indictment for alleged grand jury misconduct." Overmeyer, 899 F.2d at 465.
 
 
 13
 Defendant claims that the first indictment charging him with a conspiracy was returned on May 25, 1989. However, that indictment was returned in a separate proceeding from the Fifth Superseding Indictment at issue in this case. It is correct, as defendant asserts, that both indictments charged defendant with involvement in a conspiracy to distribute cocaine. However, we have already determined in a previous appeal by defendant that "the district court's conclusion that the government had met its burden of showing ... that the two indictments did not involve a single conspiracy is not clearly erroneous." Lacey, 1993 WL 1292, at * 8. In that appeal, we found that the criminal behavior at issue in the two indictments was not identical for double jeopardy purposes, Lacey, 1993 WL 1292, at * 6-8, and that defendant could be subject to separate charges. Defendant has cited no cases establishing that separate grand juries may not indict an individual for more than one offense, and we do not believe such a proposition has been established.
 
 
 14
 Even if we assume that defendant meant to rely on the date the original indictment was was returned in this case, July 6, 1989, we find defendant's argument meritless. Defendant relies on Fed. R. Crim. P. 6(g), which states;
 
 
 15
 A grand jury shall serve until discharged by the court, but no grand jury may serve more than 18 months unless the court extends the service of the grand jury for a period of six months or less upon a determination that such extension is in the public interest.
 
 
 16
 Defendant argues that even if the original grand jury was granted an additional six month term of service under Fed. R. Civ. P. 6(g), the Fifth Superseding Indictment in this case was returned more than two years after the original indictment and relies upon United States v. Johnson, 319 U.S. 503, 508-10 (1943); United States v. Fein, 504 F.2d 1170, 1173, 1180 (2d Cir. 1974); and United States v. Macklin, 523 F.2d 193, 194, 196 (2d Cir. 1975), which are clearly distinguishable from this case.
 
 
 17
 As the district court pointed out in its memorandum opinion and order denying defendant's motion to dismiss, the Fifth Superseding Indictment was returned by a different grand jury than the panel that returned the original indictment. The grand jury that returned the Fifth Superseding Indictment was empaneled in early 1991. Since the Fifth Superseding Indictment was returned on July 2, 1991, the grand jury was acting well within the 18 months of service allowed under Fed. R. Crim. P. 6(g).
 
 
 18
 Defendant asserts that allowing a subsequent grand jury to return an indictment over one returned by a prior grand jury permits circumvention of the mandate of Fed. R. Crim. P. 6(g). We disagree. While we have not found any cases that explicitly establish the propriety of a subsequent grand jury's return of a superseding indictment over an indictment returned by an earlier panel, we have found numerous instances in which the courts in this circuit, as well as in other circuits, have accepted a superseding indictment returned by a grand jury other than the grand jury that returned the original indictment. Indeed, it is standard practice to accept superseding indictments from different grand juries in order to make corrections to or to add defendants, charges, or details to prior indictments. See, e.g., United States v. Mundt, 29 F.3d 233, 234 (6th Cir. 1994) (allowing a second grand jury to issue a superseding indictment following dismissal of the original indictment); United States v. Battista, 646 F.2d 237, 240 (6th Cir.) (refusing to consider an attack on the validity of the original indictment because it was supplanted by a superseding indictment issued by a subsequent grand jury), cert. denied, 454 U.S. 1046 (1981); United States v. Schlesinger, 598 F.2d 722, 725 (2d Cir.) (presenting evidence to a second grand jury in order to obtain a superseding indictment containing different language), cert. denied, 444 U.S. 880 (1979).[3] Moreover, we note that since government attorneys may present evidence from prior grand juries to subsequent grand juries, United States v. Litton Sys., Inc., 573 F.2d 195, 201 (4th Cir. 1978), cert. denied, 439 U.S. 828 (1978), it is proper for a subsequent grand jury to use such information to return a valid superseding indictment. In this case, the original indictment named six defendants in a conspiracy. Superseding indictments were returned as law enforcement officers learned the true identities of the co-conspirators and as more information became known about the conspiracy's operation. This practice does not differ from the procedure in other cases, and we conclude that the grand jury empaneled in 1991, the grand jury that returned the Fifth Superseding Indictment, was authorized to return the indictment over the original indictment issued in 1989.
 
 
 19
 Defendant argues that our decision in United States v. Lash, 937 F.2d 1077, 1081 (6th Cir.), cert. denied, 502 U.S. 949 (1991), and cert. denied, 502 U.S. 1061 (1992), suggests that in the absence of a dismissal of the original indictment, the new grand jury acts "in loco juratis prioribus" and that any limitations applicable to the original grand jury, including the limitations on service contained in Fed. R. Crim. P. 6(g), are applicable to the new grand jury as well. This notion, defendant asserts, derives from our holding that "[i]t is well settled that a superseding indictment which does not broaden the charges against the defendants relates back to the date of the original indictment." Lash, 937 F.2d at 1081; see United States v. Saussy, 802 F.2d 849, 852 (6th Cir. 1986), cert. denied, 480 U.S. 907 (1987). However, we conclude that even if Lash stood for the proposition defendant suggests, it does not affect our analysis in this case. In Lash, we examined a superseding indictment that was of the same scope as the original indictment but merely alleged in more detail the acts performed in furtherance of the conspiracy being charged. We specifically noted that "[t]he dates of the conspiracy remain the same, as do the names of the conspirators and the nature and offices of the operations alleged," Lash, 937 F.2d at 1082, and that "[t]he original indictment clearly put defendants on notice of the charges against which they were to defend themselves at trial," Id. That is not the case before us. In this case, the Fifth Superseding Indictment is the first notice to defendant that he was facing charges against which he would have to defend himself. The indictment did more than add details to the allegations against the alleged co-conspirators; it broadened the scope of the conspiracy by adding additional defendants. Thus, we do not find Lash and its relation-back doctrine applicable to this case.
 
 
 20
 Because we do not find that the grand jury that issued the Fifth Superseding Indictment was acting after the expiration of its term of service, we conclude that there is no jurisdictional defect preventing the district court from trying defendant on the conspiracy charge contained in the Fifth Superseding Indictment. Furthermore, we do not find that the district court abused its discretion by refusing to dismiss the indictment in this case. "An indictment returned by a legally constituted and unbiased grand jury ... if valid on its face, is enough to call for trial of the charge on the merits." Costello v. United States, 350 U.S. 359, 363 (1956).
 
 B.
 
 21
 Defendant next argues that the district court erred by allowing witness Darryl Thomas to testify about perceived threats against him relating to his decision to testify for the government in this case. Specifically, defendant asserts that either Thomas' testimony constituted hearsay inadmissible under Federal Rule of Evidence ("Fed. R. Evid.") 802 or that the testimony should have been excluded pursuant to Fed. R. Evid. 402 as irrelevant or Fed. R. Evid. 403 because the probativity of Thomas' testimony was substantially outweighed by the danger of unfair prejudice to defendant. The government argues that the statements were properly admitted as evidence of Thomas' state of mind and as a proper response to defendant's attempts to impugn Thomas' credibility.
 
 
 22
 During the course of the trial in this case, defendant questioned the motives of the government witnesses, Thomas, Duane Moore, and Donna Woods, all of whom benefitted from their cooperation with the government with a reduced term of imprisonment. In an effort to bolster Thomas' credibility and dispel defendant's implication that Thomas had an incentive to lie about defendant's participation in the drug distribution conspiracy, the government asked Thomas during redirect examination if "there are any risks in testifying for somebody that is incarcerated when they're cooperating?" J.A. 94. Thomas replied:
 
 
 23
 Yeah. High risk. I mean you got to go back, you know. Somebody might have friends, try to have them killed or something, you know. Couple times, you know, people have spoke around me concerning that, concerning several people, you know, what they was going to do to me because of me coming here today, you know, before I come here.
 
 
 24
 J.A. 94-95. Defendant objected to this statement as hearsay, but the government responded that the question was intended to reveal Thomas' state of mind regarding his incentive to lie. The district court denied defendant's objection to the testimony and refused to strike the testimony from the record. After this exchange, the government moved away from this line of questioning. However, the district court allowed defendant to conduct re-cross examination, during which the following exchange took place:
 
 
 25
 Q. Sir, did you report these allegations to any police officer, individual with the Department of Justice, Agent Haltom, concerning threats upon your life?
 
 
 26
 A. Yeah. I mean they hear about it themselves. The police there, they have a compound. County Jail, not too long ago, they said one of my nephew's [sic] going to get killed. He came up dead. As of right now, I don't know who killed him, you understand what I am saying?
 
 
 27
 Q. It's not Mr. Lacey that you're afraid of?
 
 
 28
 A. I am not afraid of nobody. I ain't afraid of Lacey, I ain't afraid of them, you know what I am saying? But anybody, you sleep somewhere, they got some coward running around there with a knife, and try to stick you, you know. You got to be concerned about that, you know what I am saying?
 
 
 29
 Q. Absolutely. So therefore, it's not Mr. Lacey that you're afraid of, of course, it's other people in general that you have concern for, because if people find out that you're basically a snitch, that you might get "offed" is that true?
 
 
 30
 A. People find out....
 
 
 31
 J.A. 97. The government posed a final question to defendant: "Regarding your [nephew] ... is Mr. Lacey the individual you suspect?" J.A. 98. Thomas replied in the negative.
 
 
 32
 Defendant claims that the district court erred in admitting Thomas' statements about threats against him because the statements amounted to inadmissible hearsay. A district court's conclusion about whether a witness' statement constitutes hearsay is a question of law that we review de novo. United States v. Pulley, 922 F.2d 1283, 1288 (6th Cir.), cert. denied, 502 U.S. 815 (1991). Hearsay is defined in Fed. R. Evid. 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." However, "[c]ertain statements, which evidence the effect of the statements on the mind of the listener ... are not hearsay. 'Statements may ... be admitted to show ... states of mind such as knowledge, motive, fear, or reasonableness in taking particular action."' United States v. Peco, 784 F.2d 798, 804 n.3 (7th Cir.) (quoting 4 J. Weinstein & M. Berger, Weistein's Evidence p 801(c) (1984)), cert. denied, 476 U.S. 1160 (1986); see United States v. Farber, 336 F.2d 586, 588-89 (6th Cir. 1964). We conclude that Thomas' statements did not amount to hearsay; the testimony was not admitted to establish the truth of the matter asserted but was intended to dispel the idea that Thomas had no incentive to tell the truth and stood only to gain by implicating defendant in the alleged conspiracy. Thomas' assertion that he faced potentially perilous circumstances when he returned to prison after testifying showed that his "bargain" with the government was not without risk to him and that he had a good reason not to disclose everything he knew. It did not prove that Thomas had indeed been threatened by defendant.
 
 
 33
 The government's argument that this portion of Thomas' testimony was not admitted to demonstrate the truth of the matter asserted is strengthened by the fact that the government did not question Thomas about his fears or his perception of danger on direct examination. It was not until after defendant introduced the subject of Thomas' motives, by reference to his deal with the government, that the government made inquiry in this area. Moreover, as the district court noted during the trial, the question posed by the government attorney did not require an answer containing hearsay. Furthermore, the government did not dwell on the subject of Thomas' fears; once it established Thomas' state of mind, it moved on to a new area of questioning. The government even clarified on its final redirect examination that defendant was not the person whom Thomas suspected of causing harm to his nephew. Thus, we see no evidence that Thomas' statements were introduced to demonstrate that he had actually been threatened, much less by defendant. Instead, we conclude that Thomas' statements were indicative of his state of mind about testifying at this trial.
 
 
 34
 Having concluded that Thomas' statements did not constitute hearsay evidence, we must consider defendant's argument that the statements should not have been admitted because they were either irrelevant, in violation of Fed. R. Evid. 402, or because their probative value was substantially outweighed by the danger of unfair prejudice to defendant, in violation of Fed. R. Evid. 403. We note at the outset that the scope of redirect examination and other evidentiary decisions are committed to the discretion of the district court. Peco, 784 F.2d at 804; United States v. Segines, 17 F.3d 847, 856 (6th Cir. 1994). "Thus, the scope of our review is limited. The decision of the district court regarding the redirect will be overturned only if there is a showing of abuse of discretion." Peco, 784 F.2d at 804; see also United States v. Moreno, 933 F.2d 362, 375 (6th Cir.), cert. denied, 502 U.S. 895 (1991) (reviewing a district court's evidentiary rulings under an abuse of discretion standard). We find an abuse of discretion only if we are left with a "definite and firm conviction" that the district court made a mistake. Davis v. Jellico Community Hosp., Inc., 912 F.2d 129, 133 (6th Cir. 1990).
 
 
 35
 Defendant's challenge to the relevancy of Thomas' statements is meritless. The relevancy is clear; the testimony at issue made all of Thomas' other testimony more credible than it might have been had he not communicated this evidence of his state of mind. Fed. R. Evid. 402. The more difficult issue is the balancing of the probative value of the statements and their potential prejudice to defendant required by Fed. R. Evid. 403. This issue appears to be the central inquiry in cases in which threat testimony is sought to be introduced. United States v. DeLillo, 620 F.2d 939, 946 (2d. Cir.), cert. denied, 449 U.S. 835 (1980).
 
 
 36
 In United States v. Qamar, 671 F.2d 732 (2d Cir. 1982), the Second Circuit recognized that "the potential prejudice from death threats may be great. Thus, the government must have an important purpose for the evidence in order to satisfy the Rule 403 balancing test." Qamar, 671 F.2d at 736 (citations omitted). Nonetheless, evidence of death threats is subject to the same standards in the Fed. R. Evid. 403 balancing process as other evidence. Qamar, 671 F.2d at 736; DeLillo, 620 F.2d at 944. In this case, Thomas' statement that he had been "spoken to" by persons disgruntled by his decision to testify on the government's behalf is clearly probative. The statement helped the government supply the jury with a reason to believe Thomas' testimony, namely, that Thomas was risking injury by testifying and that he would only be putting himself in more jeopardy if he lied about the involvement of defendant in the alleged conspiracy. Moreover, the testimony is especially probative because it related to a matter of credibility and because defendant opened the door for Thomas' testimony by implying that he had an incentive to fabricate stories of defendant's involvement in the alleged conspiracy. See United States v. Shultz, 482 F.2d 1179, 1182 (6th Cir. 1973) (admitting testimony that witness feared defendant because of his "Mafia" connections after defendant opened the door for such testimony). Because a determination of Thomas' credibility was central to the jury's determination of guilt or innocence and because of the importance of Thomas' statement to a matter of credibility, we must give weight to the probative value of the evidence. Cf. Qamar, 671 F.2d at 736 (quoting DeLillo, 620 F.2d at 946).
 
 
 37
 The danger of unfair prejudice resulting from Thomas' testimony does not outweigh its probative value. Any prejudice resulting from Thomas' statement was diminished because the threats to which Thomas referred were never solidly linked to defendant. In fact, Thomas never attempted to finger defendant as the source of the threats against him. See United States v. Hawkins, 969 F.2d 169, 174 (6th Cir. 1992) (per curiam), cert. denied, 113 S. Ct. 1021 (1993). In addition, defendant was allowed to cross examine Thomas regarding his testimony. The government even clarified in its final question that Thomas did not suspect that defendant was involved in the death of his nephew, lessening any accusatory undertones in the testimony. Finally, because this evidence went to Thomas' state of mind and was not admitted for the purpose of showing that defendant had threatened Thomas, it had too insignificant a relation to defendant to be unfairly prejudicial. We are mindful that the district court "observed the trial firsthand, placing it in the best position to assess the impact of the testimony within the context of the proceedings," United States v. Ushery, 968 F.2d 575, 580 (6th Cir.), cert. denied, 113 S. Ct. 392 (1992), and we will not disturb the district court's exercise of its discretion in admitting Thomas' statements. See also United States v. Elledge, 723 F.2d 864, 870-71 (11th Cir. 1984).
 
 C.
 
 38
 C. court properly ordered that the sentence imposed in this case be run concurrently with a pre-existing federal sentence, it failed to properly ensure that the Bureau of Prisons would run the sentences concurrently. The district court sentenced defendant to 262 months imprisonment as a result of his conviction in this case. It also ruled that the sentence should be run concurrently with the sentence of 97 months imprisonment that defendant received for a separate conviction on October 17, 1989. However, the district court refused defendant's request that it explicitly credit defendant for his imprisonment since the date of his arrest, May 2, 1989, stating that its recommendation that defendant's sentences be run concurrently was sufficient to enable the Bureau of Prisons to correctly calculate the length of defendant's service. Defendant asserts that the district court overlooked the directions of the United States Sentencing Guidelines ("U.S.S.G.") in refusing his request.[4] We review the district court's application of the Guidelines de novo. United States v. Hicks, 4 F.3d 1358, 1361 (6th Cir. 1993) (citing United States v. Sanchez, 928 F.2d 1450, 1458 (6th Cir. 1991)).
 
 
 39
 Under U.S.S.G. Sec. 5G1.3, two sentences shall run concurrently when the "instant offense(s) arose out of the same transactions or occurrences as the unexpired sentences." Moreover, a district court has statutory discretion to impose consecutive or concurrent sentences when sentencing a defendant who is already subject to an undischarged term of imprisonment. 18 U.S.C. Sec. 3584(a); United States v. Jackson, 990 F.2d 251, 254 (6th Cir. 1993). The government does not dispute the district court's recommendation of concurrency for defendant's sentences, but defendant asserts that even though the district court ordered concurrent sentences, the district court's order is likely to result only in the aggregation of defendant's sentences and not in credit for defendant's time in prison since May 2, 1989. Defendant argues that the district court should have deducted the 55 months defendant served between his detention on May 2, 1989, and the date of sentencing in this case, December 28, 1993, from the total 262 month sentence and imposed a sentence of 207 months imprisonment. In support of this assertion, defendant relies on a 1992 amendment to U.S.S.G. Sec. 5G1.3 and an accompanying application note that directs the district court to "adjust for any term of imprisonment already served as a result of the conduct taken into account in determining the sentence for the instant offense." U.S.S.G. Sec. 5G1.3, comment, n.2.
 
 
 40
 As an initial matter, we note that defendant was properly sentenced under the 1989 Guidelines, at his own request. Although a sentencing court must ordinarily use the Guidelines in effect at the time of sentencing, 18 U.S.C. Sec. 3553(a)(4), this circuit "recognize[s] an exception to this rule 'when the Guidelines in effect at the time of sentencing provide for a higher range than those in effect at the time the crime was committed ... an ex post facto problem exists and the court must not impose a sentence in excess of that allowed by the older guidelines."' United States v. Milton, 27 F.3d 203, 210 (6th Cir. 1994) (quoting United States v. Nagi, 947 F.2d 211, 213 n.1 (6th Cir. 1991), cert. denied, 112 S. Ct. 2309 (1992)), cert. denied, 115 S. Ct. 741 (1995). Application of the 1993 Guidelines in effect at the time of sentencing in this action would have significantly increased the guideline range for defendant's offense.[5] Therefore, the district court's application of the 1989 Guidelines was proper.
 
 
 41
 As we noted earlier, the application note to which defendant directs our attention is not contained in the 1989 Guidelines but is a 1992 amendment. The Guidelines, however, must be applied in their entirety and cannot be applied in a piecemeal approach. Milton, 27 F.3d at 209-10; U.S.S.G. Sec. 1B1.11(b)(2). See also United States v. Lenfesty, 923 F.2d 1293 (8th Cir.), cert. denied, 499 U.S. 968 (1991) (rejecting defendant's request to receive the benefit of a favorable change in a later version of the Guidelines while continuing to benefit from more lenient provisions in an earlier version of the Guidelines).[6] Because defendant does not appeal the district court's use of the 1989 Guidelines, we conclude that defendant's request that the 1989 Guidelines be utilized for determining his sentence amounted to a forfeiture of his right to be sentenced under the 1993 Guidelines that contain the language to which defendant now directs our attention. Therefore, we hold that the district court did not err in refusing to adjust defendant's sentence in this case for the time served on his prior federal sentence and in leaving to the Bureau of Prisons implementation of the provision for concurrent sentences.
 
 III.
 
 42
 For the reasons stated, the judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable John C. Godbold, United States Circuit Judge for the Eleventh Circuit, sitting by designation
 
 
 [1]
 The charges were originally dropped after the prosecution refused to identify an informant. However, a state appellate court reversed that decision and reinstated the case. People v. Thomas, 174 Mich. App. 411 (1989). Appellee's Brief at 3 n.2
 
 
 [2]
 The indictment listed six defendants as members of the cocaine and marijuana distribution conspiracy: William Sabra, Stacia Greer, Carliss Bradford, Stacy Brown, Frenchy (LNU), and Donna Woods. Thereafter, superseding indictments were issued as the identities of key conspiracy members were revealed and additional actors became known
 
 
 [3]
 Defendant emphasizes that the Fifth Superseding Indictment was issued without a dismissal of the original indictment and argues that in this instance, the original indictment should have been dismissed and a new grand jury convened, rather than a new grand jury merely issuing a superseding indictment. However, a superseding indictment is, by definition, a subsequent indictment issued in the absence of a dismissal of the original, United States v. Rojas-Conteras, 474 U.S. 231, 237 (1985). Because the cases we have cited refer to subsequent indictments issued by subsequent grand juries as superseding indictments and because we have no indication that all of those courts felt required to automatically dismiss the original indictments, we find no reason to treat this case any differently and require dismissal of the initial indictment
 
 
 [4]
 The parties agreed during the sentencing hearing that the district court should utilize the Guidelines contained in the 1988 manual, those effective during 1989, to determine defendant's sentence. Therefore, unless otherwise indicated, any references to the sentencing guidelines refer to the 1989 Guidelines
 
 
 [5]
 At defendant's sentencing hearing, defendant requested that the district court apply the 1989 Guidelines, which resulted in a sentencing range of 262 to 327 months, instead of the 1993 Guidelines, which would have resulted in a sentencing range of 324 to 405 months
 
 
 [6]
 Where an amendment to the U.S.S.G. is considered a substantive amendment, rather than a clarifying one, a defendant may not benefit from both the pre-amendment version of the Guidelines and from the amended Guidelines. Milton, 27 F.3d at 210. See U.S.S.G. Sec. 1B1.11(b)(2) ("if a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes"). In Milton, we held that the 1992 amendments to U.S.S.G. Sec. 5G1.3 were substantive in nature, thus precluding a dual benefit to defendant. Milton, 27 F.3d at 210 (citing United States v. Warren, 980 F.2d 1300, 1303 (9th Cir. 1992), cert. denied, 114 S. Ct. 397 (1993))