**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Daniel H. OVERMYER,
Defendant–Appellant.**

No. 89–3696.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 25, 1990.

Decided March 26, 1990.

Rehearing and Rehearing En Banc Denied
May 10, 1990.

---

James C. Lynch, Asst. U.S. Atty. (argued), Cleveland, Ohio, for plaintiff-appellee.

Stanley S. Arkin, Marc Bogatin (argued), Stanley S. Arkin, P.C., New York City, for defendant-appellant.

Before WELLFORD and GUY, Circuit Judges, and HULL,* Chief District Judge.

* The Honorable Thomas G. Hull, Chief Judge, United States District Court for the Eastern District of Tennessee, sitting by designation.

WELLFORD, Circuit Judge.

Defendant, Daniel H. Overmyer, appeals his conviction in the United States District Court for the Northern District of Ohio on one count of filing a false proof of claim in bankruptcy in violation of 18 U.S.C. § 152, ¶ 4. Defendant challenges his conviction on two grounds. First, defendant submits that the conviction must be vacated and the indictment dismissed in light of *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Second, defendant submits that the government committed errors in its presentation to the grand jury which affected the fundamental fairness of that proceeding. This case thus presents two issues: (1) whether the finding of the district court that the government satisfied its obligations under *Kastigar* by not relying, directly or indirectly, upon immunized testimony given by Overmyer in prior bankruptcy proceedings is clearly erroneous; and (2) whether the district court abused its discretion by refusing to dismiss the indictment based on alleged prosecutorial misconduct in the grand jury process. Upon review, we conclude that the district court did not commit error, and we, accordingly, affirm.

I.

On January 28, 1986, a grand jury in the Northern District of Ohio returned a nine count indictment against Daniel H. Overmyer charging him with six counts of bankruptcy fraud in violation of 18 U.S.C. § 152, two counts of conspiracy to commit bankruptcy fraud in violation of 18 U.S.C. § 371, and one count of mail fraud in violation of 18 U.S.C. § 1341. Count one of the indictment charged that Overmyer caused Hadar Leasing International Co, Inc. ("Hadar") to file a false proof of claim in the Chapter 11 bankruptcy of D.H. Overmyer Telecasting Co., Inc. ("Telecasting"), in violation of 18 U.S.C. § 152, ¶ 4.

On October 15, 1986, the government began its case against Overmyer. Prior to the submission of the case to the jury, the

district court judge, the Honorable Sam H. Bell, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, dismissed all counts of the indictment except for counts one and three through five. On November 21, 1986, the jury returned a verdict of "guilty" on count one and "not guilty" on counts three through five.

On April 22, 1987, the district court granted Overmyer's post-trial motion for acquittal pursuant to Rule 29(c). On February 10, 1989, this court reversed the acquittal, reinstating the jury verdict. *See United States v. Overmyer*, 867 F.2d 937 (6th Cir.1989).

On July 21, 1989, pursuant to remand, the district judge sentenced Overmyer to three years imprisonment (the first six months in custody), three years probation and a $5,000 fine. Overmyer appeals from the conviction and sentence.

## II.

Starting in 1947 with a single warehouse in Toledo, Ohio, defendant Overmyer gradually expanded his operations, and by 1973, operated public warehouses in 32 states. In addition to his warehouse operations, Overmyer founded WDHO–TV (otherwise referred to as Telecasting) in Toledo in 1966. From its inception, Telecasting followed a policy of leasing its broadcast equipment from an affiliated entity. From 1976 through 1981, Hadar was the Overmyer-affiliated entity from which Telecasting leased its equipment.[1]

In 1973, due in part to problems servicing its loan indebtedness, the Overmyer warehouse companies and related entities entered Chapter 11 bankruptcy in New York. In 1976, Telecasting filed for Chapter 11 in New York.[2] This proceeding was dismissed in 1980. Telecasting refiled for Chapter 11 on February 6, 1981 in Cleveland, Ohio. Overmyer filed for personal bankruptcy in New York in May, 1982.

On March 28, 1981, the bankruptcy court for the Northern District of Ohio awarded the entire operation of Telecasting to the First National Bank of Boston (the "Bank"), its major creditor. From that time on, Overmyer had no control over the operations of Telecasting.

Following Telecasting's takeover in 1981, the Bank employed accountant Howard Klein to review the records of Telecasting. Klein reviewed the records of Telecasting and Hadar to determine the account balances between the two entities. Klein prepared a summary schedule reflecting the initial lease between Hadar and Telecasting in 1976 and all the additional leases entered into between Telecasting and Hadar.

Klein found that from 1978 through 1981 Telecasting was making lease payments to Hadar which bore no relationship to any particular lease terms. After reviewing all the documents, Klein concluded that as of January 1981, Telecasting had overpaid Hadar in accordance with the lease terms, approximately $500,000. Furthermore, Klein's analysis showed that as of August 31, 1979, Telecasting had overpaid Hadar $473,000.

On August 7, 1981, Hadar, which was also in Chapter 11 bankruptcy,[3] filed a proof of claim for $859,481.80 in the Telecasting bankruptcy proceedings.[4] In addi-

---

**1.** Prior to 1976, Telecasting leased its equipment from an Overmyer entity known as Intermodal Systems Leasing, Inc. ("Intermodal"). In April 1976, Hadar, then known as D.H. Overmyer Trucking, Inc. ("Trucking"), assumed all the leases of Telecasting's equipment from Intermodal, and Telecasting began making lease payments to Hadar.

**2.** After Telecasting's bankruptcy filing in August of 1976, Overmyer made it clear that he was in complete charge of Telecasting as Chairman, Chief Executive Officer, and Vice President of Finance. Overmyer told Telecasting's president, Mr. Dorfner, that he put Telecasting in Chapter 11 to protect the company from the continuing threats of Telecasting's major creditor, despite the fact that in 1976 Dorfner believed that the television station was producing operating profits.

**3.** Hadar filed a bankruptcy petition in the Southern District of New York in 1981, which was immediately transferred to the bankruptcy court in the Northern District of Ohio.

**4.** The proof of claim was based upon the various broadcast equipment leases between Hadar and Telecasting, a $400,000 deposit and $249,116.18 in installation costs for the leased equipment.

tion to filing a proof of claim, Hadar brought a civil action against Telecasting. Overmyer personally intervened in this action, and the matter proceeded to trial on February 22, 1982. See *In re D.H. Overmyer Telecasting Co.*, 23 B.R. 823 (Bankr. N.D.Ohio 1982), for a full account of these transactions.

The bankruptcy judge therein issued a 116–page opinion containing extensive findings of fraud in the various aspects of the Telecasting and Hadar operations. Discussed at length by Judge Ray in his opinion were: "The Hadar Lease Fraud in General"; "Particular Hadar Lease Scams"; "The Hundred East Leases" and "The Inter–Company Account Between Telecasting and Hadar". Judge Ray concluded, among other final determinations, that: "(18) The Hadar leases are shams designed to conceal the looting of Telecasting by Mr. Overmyer; ... (50) Hadar's proof of claim is fraudulent and is rejected." *Id.* at 930–932. Relying in part upon the findings of the bankruptcy court, the government obtained an indictment against Overmyer on January 28, 1986.

### III.

#### A. *The Indictment*

Count one of the indictment charged Overmyer and Edmund Connery with the fraudulent presentation of a proof of claim in the bankruptcy of Telecasting. The claim made in the amount of $859,481.80 was based on purported liabilities incurred by Telecasting in connection with the lease arrangements it had with Hadar.

The indictment alleged that the Hadar–Telecasting leases were "shams," designed solely for the purpose of transferring money out of Telecasting to other Overmyer-controlled entities. Specifically, the indictment charged that, commencing with the January 1976 transfer of the Telecasting equipment leases to Hadar, Overmyer de-

vised a scheme whereby he "caused Telecasting to make payment on these and various other leases with Hadar which had the effect of transferring monies from Telecasting to Hadar for no apparent consideration." [5] The government alleged that the payments made by Telecasting to Hadar bore no particular relationship to the purported leases with Hadar, many of the payments made by Telecasting to Hadar being a direct result of amounts needed by Overmyer for himself or for his other entities.

Count one also charged that Hadar's proof of claim was false, and that Hadar improperly billed Telecasting for certain installation costs and equipment which was never installed. The government contended that Telecasting had "overpaid Hadar for any purported leasing obligations which it might have had and owed Hadar."

#### B. *The Kastigar Hearing*

■ Overmyer filed a motion to dismiss count one alleging that the government improperly used his immunized testimony given in the bankruptcy proceedings of D.H. Overmyer Co., Inc. and Telecasting in obtaining the indictment. On September 26, 1986, the district court conducted a hearing to determine whether the government's presentation to the grand jury had been tainted by any use, direct or indirect, of Overmyer's immunized testimony.

The government's presentation at the *Kastigar* hearing consisted of the testimony of the Assistant U.S. Attorney who presented the case to the grand jury, James Lynch, and the three FBI agents successively assigned to the investigation, Gary Hall, Michael Kirkpatrick, and William Hann. Assistant U.S. Attorney Lynch and agents Hall, Kirkpatrick and Hann all testified that they had not read or reviewed transcripts of Overmyer's immunized testimony and did not believe that they had made any use of the testimony.[6] The

---

**5.** The proof of claim, on the other hand, stated that the consideration for the debt was "[l]eases of personal and real property [and] equipment installation charges." The second page of the Hadar claim provided a schedule purportedly to show the lease charges made by Hadar and

payments received from Telecasting for the period from 1979 through 1981.

**6.** The government introduced an affidavit from Assistant U.S. Attorney Ann Rollin, who had responsibility for the investigation prior to Mr.

government's witnesses all stated that the investigation was based upon the bankruptcy proceedings and the opinion filed in *In re D.H. Overmyer Telecasting Company, Inc.*

The defendant called attorney John Silas Hopkins, the Bank's trial counsel at the bankruptcy proceedings. Hopkins testified that he had met many times with government representatives in connection with the investigation of Overmyer. Before the 1982 adversary proceedings, Hopkins indicated that he worked on a case involving the *First National Bank of Boston v. Daniel Harrison Overmyer* in the Superior Court in Massachusetts in December of 1980. In that proceeding, Hopkins took Overmyer's deposition. Hopkins also took part in Overmyer's deposition during the Hadar adversary proceedings in Cleveland, Ohio. During the course of this deposition, Hopkins used a small portion of the 1976 proceedings[7] to refresh Overmyer's recollection as to one question.

Hopkins testified that the only testimony given by Overmyer prior to the adversary proceedings in 1982, which he considered important, was the testimony he gave in the deposition in the Suffolk Superior Court in Massachusetts. Hopkins indicated that the other transcripts were of very little importance, but were read simply for completeness. When asked whether he imparted information to the government with respect to the review of Overmyer's testimony, Hopkins testified that he couldn't think of anything specifically, but stated that it was possible that some information came from transcripts of depositions (i.e., depositions given in the *Boston* case and the deposition given by Overmyer in the Hadar adversary proceeding, neither of which contained immunized testimony). Furthermore, with respect to the 1976 proceedings, Hopkins testified that there was nothing in the transcript which would have been of interest to the government's investigation of the fraud allegations, and fur-

ther, if anyone had asked him, that he would have told them as much.

The district court denied Overmyer's motion after the hearing. The court held:

In this action, the evidence presented at the hearing of September 25, 1986, demonstrates that neither the Government prosecutors involved in these proceedings, or [sic] the three FBI agents who investigated the charges in the indictment ever directly utilized any prior immunized testimony of Mr. Overmyer. Instead, the record affirmatively shows that with the exception of the testimony given on June 10 and 11, 1976 by Mr. Overmyer, the Government was not even aware of the existence of any immunized testimony until after this motion was filed. As to the June 10 and 11 testimony, the Government has demonstrated that such testimony has also not been utilized in the investigation or presented to the grand jury.

It should be noted that the court has reviewed with care the transcripts of all the prior testimony of Mr. Overmyer at issue and *finds that this testimony has little relevance to the claim made in the indictment. This action concerns the alleged violations of law which occurred after the D.H. Overmyer Telecasting Company, Inc. filed bankruptcy in the United States Bankruptcy Court in the Northern District of Ohio on February 6, 1981. On the other hand, the transcripts of Mr. Overmyer's testimony involved primarily events which occurred years earlier and are not related to this indictment.* The Government has demonstrated that the evidence utilized in the investigation and presented to the grand jury primarily involves the issues raised in Judge Ray's opinion in *In re D.H. Overmyer Telecasting Co., Inc.*, 23 B.R. 823 (Bankr.N.D. Ohio 1982), and not any earlier proceedings.

---

Lynch. Ms. Rollin denied ever having reviewed a transcript of the June 10, 1976 immunized testimony by Overmyer. The Assistant U.S. Attorney Richard Lillie, who assisted Mr. Lynch at

the trial, stated for the record that he had never read the immunized transcripts.

7. *See* the reference in n. 2.

Accordingly, the court finds that the Government has not utilized the immunized testimony of Mr. Overmyer in any manner that would violate the defendant's constitutional or statutory right against self-incrimination. Therefore, the defendant's motion to dismiss the indictment is denied.

(Emphasis added).

## IV.

### A. *Immunity*

Overmyer was examined on five separate occasions during the course of the New York bankruptcy proceedings of D.H. Overmyer Co. and Telecasting. Section 7(a)(10) of the former Bankruptcy Act provided in relevant part:

The bankrupt shall ... at the first meeting of his creditors, at the hearing upon objections, if any, to his discharge and at such other times as the court shall order, submit to an examination concerning their conducting of his business, the cause of his bankruptcy, his dealing with his creditors and other persons, the amount, kind, and whereabouts of his property, and, in addition, all matters which may affect the administration and settlement of his estate or the granting of his discharge; but no testimony, or evidence which is directly or indirectly derived from such testimony, given by him shall be offered in evidence against him in any criminal proceeding, except such testimony as may be given by him

in the hearing upon objections to his discharge. . . .

11 U.S.C. § 25(a)(10) (1976).[8] Under this provision, an individual bankrupt who submitted to examination received use and derivative use immunity in a subsequent criminal case for testimony during certain bankruptcy proceedings concerning the circumstances of a failed business. *United States v. Rogers*, 722 F.2d 557, 560 (9th Cir.1983), *United States v. Beery*, 678 F.2d 856, 860 (10th Cir.1982). Likewise, an officer who appeared for examination on behalf of a corporate debtor received immunity under section 7(a)(10).[9] *Rogers*, 722 F.2d at 559–60. Therefore, Overmyer's testimony at the New York bankruptcy hearings of D.H. Overmyer Co. and Telecasting is protected.

Grants of use and derivative use immunity prohibit the use of compelled testimony and evidence derived therefrom in later criminal proceedings. *Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661. The Supreme Court stated that a grant of immunity "imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." 406 U.S. at 460, 92 S.Ct. at 1665 (citing *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964)).[10] In order to meet the burden of proof under *Kastigar*, the government must establish by a preponderance of the evidence that the evidence used against the defendant was obtained from a legitimate,

---

**8.** This statutory provision has been modified substantially by the new Bankruptcy Code. *See* 11 U.S.C. § 344 (1979). Immunity is no longer automatically available without a claim of the privilege against self-incrimination.

**9.** The immunity provided by Section 7(a)(10) is identical with the general federal immunity statute, 18 U.S.C. § 6002, and is thus coextensive with the fifth amendment privilege against self-incrimination. *Rogers*, 722 F.2d at 560; *see also Kastigar v. United States*, 406 U.S. at 462, 92 S.Ct. at 1666.

**10.** In *Murphy*, involving federal use of testimony given before a state court, the Supreme Court held:

Once a defendant demonstrates that he has testified, under a state grant of immunity, *to matters related* to the federal prosecution, the

federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an *independent, legitimate source* for the disputed evidence.

378 U.S. at 79 n. 18, 84 S.Ct. at 1609 n. 18 (emphasis added). A defendant seeking to avoid prosecution first must show *that* the immunized testimony at issue is *related* to the crime for which he is charged. *See Beery*, 678 F.2d at 863 ("The district court should first require Beery to demonstrate that he was required to submit to an examination at the bankruptcy proceedings covered by § 25(a)(10) *concerning matters relating to the federal prosecution.* If such a showing is not made by defendant, the convictions should be reinstated." (emphasis added)).

independent source. *Rogers,* 722 F.2d at 560 (citing *United States v. Romano,* 583 F.2d 1, 7 (1st Cir.1978) and *United States v. Seiffert,* 501 F.2d 974, 982 (5th Cir. 1974)). This burden upon the government is a "heavy" one. *Kastigar,* 406 U.S. at 461, 92 S.Ct. at 1665.

## B. *Standard of Review*

The standard of review of a trial court's determination as to the government's satisfaction of its burden under *Kastigar* is whether the trial court's decision is clearly erroneous. *United States v. Serrano,* 870 F.2d 1, 19 (1st Cir.1989); *Rogers,* 722 F.2d at 560; *United States v. Provenzano,* 620 F.2d 985, 1005 (3d Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980).

Prior to trial, Overmyer moved for a hearing pursuant to *Kastigar* in order to determine whether the grand jury presentation had been tainted by any use, direct or indirect, of his immunized testimony and to put the government to its constitutional obligation of proving an independent source for every item of evidence presented to the grand jury and to be presented at trial. The district court held a hearing on September 26, 1986 and later issued an order concluding that Overmyer's immunized testimony had not been utilized by the government "in any manner that would violate [Overmyer's] constitutional or statutory right against self-incrimination."

The district court noted that Overmyer's immunized testimony had "little relevance to the claims made in the indictment," and that the evidence utilized in the government's investigation and presented to the grand jury "primarily involve[d] the issues raised in Judge Ray's opinion in *In re D.H. Overmyer Telecasting Co.* ... and not any earlier proceedings."

Overmyer introduced six transcripts allegedly containing immunized testimony. Some of these contain testimony from pro-

ceedings before the bankruptcy court for the Southern District of New York.[11] One includes the identification of Overmyer and does not contain testimony. In its brief, the government concedes that four of Overmyer's *Kastigar* exhibits contain testimony given by Overmyer which is immunized by the former Bankruptcy Act. The government, however, contends that the immunized testimony is not related to the issues involved in the prosecution of Overmyer for presenting a false claim in the bankruptcy of Telecasting in the Northern District of Ohio in August of 1981.

We find Overmyer's argument that his testimony in 1976 and 1977 related to matters which had not occurred, namely filing of the bankruptcy proof of claim in 1981, to be without merit. Although the government evidence presented in this case did trace the history, background and relationship that Overmyer had with his various businesses, his testimony in 1976 and 1977 did not reveal the pattern of fraud demonstrated by the relationship between Hadar and Telecasting which resulted in the filing of the proof of claim in 1981. An analysis of the transcripts reveals that the district court was not in error in concluding that Overmyer's *Kastigar* transcripts contained little relating to the issues in the criminal case.

## C. *Exhibit Analysis*

Overmyer's *Kastigar* Exhibit H–A contains transcripts of testimony from the New York bankruptcy proceedings of D.H. Overmyer, Inc. in 1976. There is, however, very little substantive testimony by Overmyer in Exhibit H–A. Overmyer responded *twenty-six* times with the answer of "I don't know." Overmyer testified as to the relationships between several entities, namely Jeebs, Weather Vane, HMO trust, and Danville Private Rental Homes, Inc. In the second part, Overmyer testified that

**11.** Exhibit H–A contains testimony given by Overmyer in the bankruptcy proceeding of the D.H. Overmyer Co., Inc. in the Southern District of New York. Exhibits H–C, H–D, and H–E contain testimony given in 1976 and 1977 in the bankruptcy proceedings of Telecasting pending in the Southern District of New York. Exhibit H–F is a transcript of the proceedings in the bankruptcy court in the Northern District of Ohio containing a brief portion of the testimony given by Overmyer in the March 1977 Telecasting bankruptcy proceedings.

Jeebs was a "management corporation" providing "management services" consisting of "accounting, legal, [and] business advice of all kinds" to various Overmyer entities including Telecasting. Overmyer stated that he was a consultant to Jeebs.

Overmyer's *Kastigar* Exhibit H–C is another 1976 transcript from an examination in the Telecasting bankruptcy. Overmyer testified therein about the ownership of Jeebs, the nature of the payments by Telecasting to Jeebs including a monthly service fee, his role as consultant to Jeebs, and the value of services rendered by Jeebs to Telecasting.

Overmyer's *Kastigar* Exhibit H–D is further 1977 testimony in the Telecasting bankruptcy. Overmyer gave responses with regard to the relationship between Jeebs and Telecasting, payments from Telecasting to Jeebs for rental space, the nature of services provided to Telecasting by Jeebs, and the identity of the individuals performing those services. Overmyer also testified that the leases of equipment between Telecasting and Trucking (the former name of Hadar) were for "all kinds of equipment," and that Trucking purchased the lease contracts from Intermodal.

Overmyer's *Kastigar* Exhibit H–E contains testimony from a later hearing in the Telecasting Chapter 11 proceeding in 1977. At this hearing, Overmyer explained that the equipment at Telecasting was leased from Trucking, that the stock of Trucking was in trust for his children, and that Trucking collected approximately $21,000 per month from Telecasting for the equipment leases.

None of the testimony given in these proceedings indicates fraud or suggests in any way that Overmyer was making use of the lease arrangements between Telecasting and Trucking for his personal gain. Moreover, there was no suggestion or questioning regarding the status of payments between Telecasting and Trucking that would reflect that Trucking was over-

paying Telecasting. Given that a minor portion of the information contained in these exhibits relates to the later criminal prosecution for filing a false proof of claim, we find this relationship to be so remote that any use would constitute harmless error, especially in light of the lengthy and substantial testimony of Overmyer, which was not immunized. *United States v. Shelton,* 669 F.2d 446, 464 (7th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982); *Rogers,* 722 F.2d at 560; *Serrano,* 870 F.2d at 16.

Even if some violation of *Kastigar* occurred, and we are not persuaded that it did, we find that the government established, by its requisite burden, a legitimate and independent source for its evidence used in the criminal prosecution of Overmyer.[12] First, the extensive opinion by Judge Ray identifying the extensive factual basis for the court's findings that there was civil fraud on the part of Hadar in connection with the bankruptcy proceedings was a prime and legitimate source. Second, Overmyer gave unprotected testimony on four separate occasions in 1980 and 1981 in which he testified about the various aspects of his role in the Hadar–Telecasting lease arrangement. Third, various others who testified at and took part in the adversary bankruptcy proceedings provided information to the government, none of which we find to be based on Overmyer's immunized testimony. We, therefore, conclude that the findings of the trial court with regard to the *Kastigar* hearing were not clearly erroneous.

## V.

Finally, Overmyer claims that there were three errors in the grand jury process, the cumulative effect of which rendered the grand jury proceedings fundamentally unfair and which require the dismissal of the indictment.

12. All government personnel involved in the investigation and prosecution of Overmyer testified that they had not reviewed any of the immunized transcripts of Overmyer's testimony from 1976 and 1977. These conclusory statements, however, are not sufficient proof of the legitimate and independent sources necessary to satisfy the burden under *Kastigar. Beery,* 678 F.2d at 863; *United States v. Nemes,* 555 F.2d 51, 55 (2d Cir.1977).

First, Overmyer argues that the prosecutor made a misleading suggestion to the grand jury that Overmyer had a prior criminal record. The standard of review of a district court's refusal to dismiss an indictment is whether there was an abuse of discretion. *United States v. Powell,* 823 F.2d 996, 1001 (6th Cir.1987). Because of the well-accepted principle that grand jury indictments are presumed valid, we exercise extreme caution in dismissing an indictment for alleged grand jury misconduct. *United States v. Jones,* 766 F.2d 994, 1001 (6th Cir.), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 526, 88 L.Ed.2d 458 (1985); *Beatrice Foods Co. v. United States,* 312 F.2d 29, 39 (8th Cir.), *cert. denied,* 373 U.S. 904, 83 S.Ct. 1289, 10 L.Ed.2d 199 (1963). Courts do not encourage tampering with the grand jury indictment even where faulty instructions are given. *United States v. Felice,* 481 F.Supp. 79 (N.D.Ohio 1978), *aff'd,* 609 F.2d 276 (6th Cir.1979).

A U.S. Attorney elicited testimony before the grand jury that Overmyer had been indicted and tried on an unrelated criminal charge in Louisville, Kentucky. Although this information was revealed in the questioning of Morton S. Robson, there is no indication in the record that the failure to inform the grand jury that Overmyer had been acquitted was deliberate or was delivered in a manner calculated to inflame the grand jury. The action by the prosecution in this case, though certainly not endorsed, does not appear to reach the level of misconduct present in the cases cited by Overmyer. *See United States v. Hogan,* 712 F.2d 757 (2d Cir.1983) (involving the presentation of extensive hearsay and double hearsay before the grand jury including one defendant's involvement in two murders and corrupt activities which accusations appeared to have been made in order to depict defendants as bad persons rather than to support additional charges); *United States v. Vetere,* 663 F.Supp. 381 (S.D.N.Y.1987).

Second, Overmyer argues that the prosecutor provided the grand jury with erroneous and incomplete instructions with respect to the offense of presenting a false proof of claim. Although the instructions given to the grand jury may not have been crystal clear, they were sufficient to inform the jury of the issues involved, especially with respect to the primary issue of willfulness. If read together with the indictment, the grand jury instructions adequately informed the grand jury of the elements of the offenses.

Finally, Overmyer complains that less than twelve of the grand jurors who voted to indict heard all of the evidence. This, however, has not been recognized as a requirement for the proper return of an indictment. *See United States v. Cronic,* 675 F.2d 1126, 1130 (10th Cir.1982), *rev'd on other grounds,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *United States v. Leverage Funding Systems, Inc.,* 637 F.2d 645, 649 (9th Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981).

In sum, Overmyer has not demonstrated the type of prejudice to justify either dismissal of the indictment or reversal of his conviction.

We therefore AFFIRM.