99 F.3d 1140
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Donald Lee CULBREATH, Defendant-Appellant.
 No. 96-5685.
 United States Court of Appeals, Sixth Circuit.
 Oct. 17, 1996.
 
 Before: KENNEDY, DAUGHTREY, and WEIS,* Circuit Judges.
 PER CURIAM.
 
 
 1
 The defendant-appellant, Donald Lee Culbreath, was convicted of three counts of bank fraud in connection with his improper use of sight drafts to obtain use of money belonging to the Community Bank of Germantown, in violation of 18 U.S.C. § 1344. As punishment, the district court ordered Culbreath to serve six months in prison and two years on supervised release, and to pay a $25,000 fine and a mandatory $150 special assessment. On appeal, Culbreath now raises multiple issues challenging his conviction and the adequacy of his trial counsel. Finding no reversible error, we affirm the district court's judgment.
 
 PROCEDURAL AND FACTUAL BACKGROUND
 
 2
 During 1990, Culbreath owned Southern Wholesale Motors, Inc., a Memphis company specializing in retail and wholesale sales of "high line" automobiles. As part of his business, Culbreath opened corporate accounts at the Community Bank of Germantown and also secured a $150,000 line of credit at that bank. With that credit line in place, he was then able to buy and sell his automobiles by means of a recognized procedure utilizing sight drafts.
 
 
 3
 According to a Community Bank official, draft sales were accomplished by the seller filling out a draft envelope with information regarding the vehicle involved and the parties to the transaction. When the draft was presented to the seller's bank, that institution would log the pertinent information and immediately credit the seller's account with the purchase price of the automobile. The draft would then be sent to the buyer's bank address listed on the envelope. Upon receipt, the buyer's bank would contact the buyer and request acceptance of the draft. If the draft were in fact accepted, the buyer would direct the buyer's bank to prepare a cashier's check in the amount of the sale price to be sent back to the seller's bank to reimburse that institution for originally crediting the seller's account for the amount of the sale. If, however, the buyer chose not to accept the draft sent to the buyer's bank, that information would be transmitted to the seller's bank, which would then debit the seller's account for the amount of money previously "advanced."
 
 
 4
 In March 1990, Culbreath presented a draft in the amount of $7,800 to Community Bank of Germantown for the sale of a 1984 Chevy Custom Van to Jack Wall in Florida. That van had, however, been sold years before by Culbreath to another individual, and the defendant no longer was in a position to transfer proper title of that vehicle. Nevertheless, Culbreath himself filled out the information on the draft envelope, designated Wall's business address, rather than the bank address, on the document, and enclosed the title for another similar vehicle, not for the 1984 Chevy van. Community Bank, not aware of the false nature of the information on the draft, credited Culbreath's account immediately for the $7,800. That money was not retrieved from Culbreath's account until late June, when the bank finally realized it had not yet been reimbursed by Wall or by his bank.
 
 
 5
 The defendant conceded that the title included in the draft envelope was not the correct title and that he was not then in possession of the 1984 van listed on the draft. He testified at trial, however, that the errors were honest mistakes and were not the result of an intent to defraud Community Bank of Germantown. Culbreath even claimed that, although he was unable to cover the charge back of this and other drafts to his account until many months later, he immediately informed his bank of the inadvertent error. Bank officials were unable to recall any such communication from Culbreath and testified that any credit to the defendant's account would have been promptly cancelled if the institution had learned that Culbreath was attempting to sell a vehicle to which he no longer held proper title.
 
 
 6
 On April 19, 1990, Culbreath submitted a second draft to Community Bank of Germantown for sale of an automobile to Jack Wall in Florida. The 1977 Mercedes that was the subject of that draft had, however, previously been sold to one Jay Conrad, who retained possession of the car even though Culbreath did hold a security interest in it. As in other draft transactions, the defendant's account was immediately credited with the sales price of the car, $14,200, upon submission of the draft. Not until 10-12 days later was Culbreath's account recharged for that amount after the bank learned that Wall had refused acceptance of the draft.
 
 
 7
 In all, Community Bank of Germantown investigated six drafts sent on behalf of Culbreath to a Florida address to effect a sale of a vehicle to Jack Wall. In each of those cases, the bank later determined that the address provided by the defendant did not correspond to Wall's bank but to his business address. Because the drafts were not sent to another financial institution that would promptly contact the buyer to accept or reject the sale, the drafts were able to languish in Wall's possession until they were eventually returned to Culbreath. Consequently, Community Bank of Germantown was delayed in regaining control over money that the defendant was then able to use between the time of the initial presentation of the draft and its ultimate rejection.
 
 
 8
 Additional testimony was offered by Jack Wall himself, who claimed that he had not agreed to purchase any vehicles from Culbreath during 1990. When his bank received drafts from the defendant, therefore, he ordered them returned and requested that Culbreath refrain from forwarding any more such requests for payments for sales not negotiated. Wall also contended that Culbreath contacted him approximately one year prior to trial and asked him to give a deposition stating that "I shipped you the cars, that you did not want the cars, and you had to ship them back."
 
 
 9
 On cross-examination, the defendant's attorneys were able to impeach Wall effectively. For example, counsel established that Wall did indeed buy at least one vehicle from Culbreath during 1990. Defense counsel were even able to secure an admission from Wall that the witness was unsure whether he had purchased the Chevy van and the Mercedes from the defendant.[1] Despite such impeachment, however, counsel did not introduce at trial documentary evidence that Wall's bank and Culbreath's bank had sent numerous drafts to each other during 1990, including two drafts actually accepted and paid by Wall's bank.
 
 
 10
 Other trial testimony established that approximately one month after the draft for the sale of the Mercedes was sent to Wall, the defendant caused a $13,700 draft for the sale of that same, previously-sold car to be sent to the bank of Robert Wayne Jones, another automobile dealer in the Memphis area. When Jones was called by his bank to accept or reject the draft, he in turn telephoned Culbreath, who promised to pick up the draft. When the defendant did not do so in three days, however, Jones directed his bank to return the draft to the Community Bank of Germantown. Moreover, during his trial testimony, Jones denied that he and Culbreath ever had an agreement to transfer ownership of the 1977 Mercedes in question. He did explain, however, that Culbreath had approached him in 1990 and inquired whether Jones would "float a draft," or stall the bank, for the defendant because Culbreath was experiencing cash flow problems.
 
 
 11
 As in the case involving the attempted transfer of the Chevy van, Culbreath insisted during his trial testimony that the draft irregularities involving the 1977 Mercedes were the result of an innocent mistake. Specifically, the defendant contended that he retained a security interest in that vehicle and that he was under the impression that he was thus justified in trying to sell the car, even though he did not have physical possession of it. Again, officials of the Community Bank of Germantown were adamant in claiming that had they been aware of what Culbreath was allegedly attempting to accomplish, they would not have allowed the original draft credit to be made to the defendant's account.
 
 
 12
 In May 1991, after it had been sued in another matter by Culbreath, Community Bank of Germantown made a criminal report concerning the questionable draft practices of the defendant during 1990. Almost four years later, in February 1995, Culbreath was indicted by a federal grand jury on three counts of bank fraud in connection with the drafts purporting to sell the 1984 Chevy van and the 1977 Mercedes.
 
 
 13
 A trial was conducted in July 1995, at the conclusion of which the jury found Culbreath guilty on all three charges. After the denial of post-trial motions, a sentencing hearing was held and the defendant was sentenced to six months in prison, two years on supervised release, fined $25,000, and ordered to pay a $150 special assessment. Culbreath now appeals from the judgment of conviction and the sentencing determination.
 
 DISCUSSION
 Refusal to Dismiss Indictment
 
 14
 In his first issue, Culbreath contends that the district court erred in refusing to dismiss the indictments returned against him. Specifically, he insists that the almost four-year pre-indictment delay prejudiced his ability to receive a fair trial and that the charging instrument failed to allege a crime because the bank suffered no loss due to his actions.
 
 
 15
 Grand jury indictments are presumed valid. As a result, this court reviews a district court's refusal to dismiss an indictment only for an abuse of discretion. United States v. Overmyer, 899 F.2d 457, 465 (6th Cir.), cert. denied, 498 U.S. 939 (1990).
 
 
 16
 Culbreath first attempts to establish prejudice from the delay between the initiation of the criminal investigation into his draft procedures and the return of the indictment charging him with bank fraud by stating that two crucial defense witnesses died in the interim. Even if such prejudice could be shown, however, dismissal of the indictment in this case would not necessarily be proper. As we recognized in United States v. Duncan, 763 F.2d 220, 222 (6th Cir.1985):
 
 
 17
 Dismissal for pre-indictment delay is warranted only when the defendant shows substantial prejudice to his right to a fair trial and that the delay was an intentional device by the government to gain a tactical advantage.... Both parts of the test must be met before a defendant is entitled to have the indictment dismissed.
 
 
 18
 (Citations omitted; emphasis in original.)
 
 
 19
 The record in this matter contains absolutely no evidence of any intent on the part of the government to gain a tactical advantage over Culbreath by delaying the issuance of the indictment. In fact, in his reply brief on appeal, Culbreath concedes that no such evidence exists. We find that the district judge did not abuse his discretion in refusing to dismiss the indictment against the defendant.
 
 
 20
 Moreover, the deaths of Culbreath's purported witnesses were not as prejudicial to the defense as the defendant implies. As argued by the government, other defense witnesses offered testimony similar, if not identical, to the evidence that would have been offered by the now-deceased individuals. Culbreath, nevertheless, contends that the credibility of one witness testifying to attempts by the defendant to repossess the Mercedes would have been bolstered by corroborating testimony from a witness who died prior to indictment. Even if it could be assumed that the jury would have been more likely to believe that account, a mere unsuccessful attempt to repossess an automobile does not legitimate Culbreath's attempt to gain money for the sale of a vehicle not in his possession. Such information also does not change the fact that Community Bank of Germantown would have been unwilling to credit the defendant's account on the basis of the draft had it been aware that such questionable transactions were being attempted.
 
 
 21
 The defendant also insists that another now-deceased witness, had he been able to testify, could have confirmed Culbreath's testimony regarding the alleged mistake concerning the attempted sale of the Chevy van. The defendant argues that the witness's death also resulted in the destruction of business records that could have been helpful to the defense. Although they may not have been able to provide the depth of knowledge of the deceased witness, that witness's sons were able to testify at trial regarding the alleged attempts to locate the proper van. Furthermore, the missing records might not have been available for trial even if the indictment had been returned sooner. The witness in possession of those documents died in December 1991, only months after the commencement of the federal investigation into Culbreath's dealings. If the records were destroyed upon that individual's death even though the investigation was ongoing, there is no assurance that a substantially earlier return of the indictment would have affected the availability of those business records.
 
 
 22
 In arguing for the dismissal of the indictment against him, Culbreath also insists that the charging instrument does not allege a crime because the Community Bank of Germantown suffered no loss as a result of the defendant's financial dealings. The crime of bank fraud, however, "requires only a fraudulent statement designed to influence a bank's action," United States v. Walker, 871 F.2d 1298, 1305 n. 6 (6th Cir.1989), not actual monetary loss.[2]
 
 
 23
 Culbreath contends that just as a check is not in and of itself a "false statement," under Williams v. United States, 458 U.S. 279, 284-85 (1982), the sight drafts presented by the defendant were not misrepresentations of auto sales because the buyer could always reject the tendered goods and the bank would receive its money back by debiting the seller's account. Therefore, he claims, all elements of the offense were not alleged in the indictment. Other courts have concluded, however, that sight drafts containing attached titles to represent assertions by the seller. As noted by the Fourth Circuit in United States v. Bonnette, 781 F.2d 357, 365 (4th Cir.1986), such documents assert "that a car had been sold for the value indicated on the sight draft and ... that a car in fact existed." Even when the titles are not stapled directly to the drafts, such documents are considered false factual assertions made with intent to defraud, because the defendant "knew that the Bank believed that the envelope[ ] drafts represented actual, legitimate sales of vehicles, and that he used that perception to deceive the Bank in order to obtain an immediate credit on non-existent sales." United States v. Swearingen, 858 F.2d 1555, 1557 (11th Cir.1988), cert. denied, 489 U.S. 1083 (1989).
 
 
 24
 Similarly, in this case, the drafts presented by Culbreath must be considered false representations made with the intent to defraud. Although the bank may have eventually retrieved the money it credited to the defendant's account, the institution was without use of those funds for a period of time due to the fact that Culbreath "stated" that he had contracted for the sales of vehicles that had in fact been sold previously to other individuals. Under such circumstances, we conclude that the prosecution sufficiently alleged the crime of bank fraud so as to justify the district court, in the exercise of its discretion, in refusing to dismiss the indictment in this matter.
 
 
 25
 Introduction of Evidence Subject to an Earlier Motion In Limine
 
 
 26
 Culbreath next contends that the district court erred in allowing the prosecution to introduce evidence that all sight drafts presented by the defendant in the three-month period immediately preceding the return of the drafts that are the subject of the indictment in this case had also been returned. He argues that the court had previously ruled on a motion in limine that such information should not be placed before the jury.
 
 
 27
 This court reviews an appellate challenge to the admission of allegedly prejudicial evidence under an abuse of discretion standard. United States v. Bonds, 12 F.3d 540, 554 (6th Cir.1993). Thus, such a decision will be reversed only when the district court applies an incorrect legal standard, misapplies the proper legal standard, or relies upon clearly erroneous findings of fact. First Technology Safety Sys., Inc. v. Depinet, 11 F.3d 641, 647 (6th Cir.1993).
 
 
 28
 Culbreath originally requested, and the district court ordered, that evidence of the returned drafts not pertaining to the charged offenses not be presented to the jury. When the defendant claimed during his trial testimony, however, that he was not experiencing any more cash flow problems than usual at the time he presented the drafts that are the subject of this indictment, the court permitted the government to explore the discrepancy in the return rate of drafts from the spring of 1989 and the spring and early summer of 1990. Such impeachment of testimony is proper on cross-examination. Hence, the district court did not abuse its discretion in allowing the government to conduct the limited inquiry necessary to illuminate the false statement contained in the witness's testimony.
 
 Ineffective Assistance of Counsel
 
 29
 In a third issue, Culbreath asks this court to rule that his trial attorneys provided him with ineffective assistance of counsel, even though the district court has not yet conducted a hearing on this matter. Generally, ineffective assistance of counsel claims will not be heard on appeal if not raised first in the district court. United States v. Hubbard, 16 F.3d 694, 703 (6th Cir.1994), rev'd in part on other grounds, 115 S.Ct. 1754 (1995). "The exception to this rule is where the record on appeal is adequate to assess the merits of the defendant's allegations." Id. Culbreath now contends that this record is adequate to justify this court's examination of the claim.
 
 
 30
 Most of the defendant's contentions regarding the performance of his trial counsel involve the propriety of trial strategy choices made by the attorneys. A proper examination of the legitimacy of such choices is necessarily dependent upon matters outside the appellate record. See United States v. Snow, 48 F.3d 198, 199 (6th Cir.1995). We therefore conclude that this issue is best left for a proceeding pursuant to 28 U.S.C. § 2255, in which Culbreath may seek to develop an adequate factual basis for his claim.
 
 
 31
 Failure of Government to Correct Testimony of Its Own Witness
 
 
 32
 Witness Jack Wall testified under oath at trial that he had not engaged in any draft transactions with Culbreath during 1990. At the time of that testimony, however, the government had already seen, and indeed had submitted to defense counsel, documentary evidence that Wall had received 16 drafts[3] from the defendant between February and June 1990.[4] Culbreath insists that knowledge of the false testimony, combined with the prosecution's failure to bring that discrepancy to the attention of the court and jury, deprived him of his due process right to a fair trial.
 
 
 33
 The knowing use of false testimony by the government may constitute a denial of due process, if the court finds a reasonable likelihood that the incorrect statements could have affected the judgment of the jury. United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir.1989) (citing United States v. Bagley, 473 U.S. 667, 678 (1985)). To establish a denial of due process by use of false testimony, a defendant must show that "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." Id.
 
 
 34
 In this instance, regardless of whether the challenged statement was actually false or whether the government knew it to be false, Culbreath cannot establish that the statement was material. Although Wall did claim he did not exchange drafts with Culbreath in 1990, he obviously meant that he did not remember buying any cars from the defendant in 1990 by draft, because only two pages in the trial transcript after making that assertion, Wall began discussing the 1990 drafts he received from Culbreath. Even the false claim that he did not purchase vehicles from the defendant in 1990 by draft is not material, moreover, because neither vehicle actually obtained by Wall from Culbreath during 1990 was a subject of the indictment in this matter. The two men's dealings involving those purchases are, therefore, irrelevant to the issue of whether Culbreath caused an improper draft involving a vehicle that was not even for sale to be sent to Wall. The failure of the government to correct Wall's testimony thus did not deny the defendant a fair trial.
 
 
 35
 Refusal to Allow Admission of Evidence Not Disclosed in
 
 Reciprocal Discovery
 
 36
 After Wall testified that, "[t]o the best of [his] knowledge, [he] never bought any cars" from Culbreath, the defendant attempted to introduce into evidence a check written by Wall for just such a purchase. Because the check had not been provided to the prosecution as part of reciprocal discovery, however, the district court refused to allow admission of that document. The court did, nevertheless, inform defense counsel that they could show the check to Wall in order to refresh the witness's recollection. After they had done so, Wall admitted that he had, in fact, bought automobiles from Culbreath during calendar year 1990.
 
 
 37
 Despite the defendant's protests to the contrary, the district court's decision to deny admission of the check into evidence did not in any way prejudice Culbreath. By permitting counsel to refresh the witness's recollection, the very information that Culbreath wished to highlight--that Wall may not be credible and that Wall had indeed purchased vehicles from the defendant--was placed before the jury. Moreover, because the check did not relate to transactions involving any of the vehicles listed in the indictment, such documentation regarding a collateral matter was irrelevant to the issues germane to this prosecution. The district court did not, therefore, abuse its discretion in denying admission of the proffered evidence.
 
 Sufficiency of the Evidence
 
 38
 Culbreath next submits that the evidence adduced at trial was insufficient to support his convictions for bank fraud. He does concede that the vehicles which were the subjects of the sight drafts at issue in this matter were not in his possession at the times he attempted to resell them. He also cannot dispute that his bank account was credited with the purchase prices of those vehicles based upon the Community Bank of Germantown's reliance upon the validity of the drafts. Culbreath insists, however, that any mistakes in the financial transactions were innocent business errors, that he had agreement with Wall and Jones to sell the vehicles in question, and that rejection of the testimony of Wall and Jones should lead a trier of fact to conclude that the defendant was not guilty of bank fraud.
 
 
 39
 On appeal, this court may not rule upon the credibility of the witnesses or substitute its judgment for that of the jury. See United States v. Hilliard, 11 F.3d 618, 620 (6th Cir.1993), cert. denied, 510 U.S. 1130 (1994). After reviewing the evidence in this case in the light most favorable to the prosecution, as we must, we conclude that a rational trier of fact could find beyond a reasonable doubt that Culbreath, by means of false representations, obtained the temporary use of money owned by a financial institution. The evidence presented at trial was, therefore, sufficient to support the convictions. See Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 40
 For the reasons set out above, we AFFIRM the judgment of the district court.
 
 
 
 *
 The Hon. Joseph F. Weis, Jr., Circuit Judge,
 United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 [1]
 Nevertheless, Culbreath himself conceded during trial that vehicles listed in the indictment were not sold and were never sent to Wall
 
 
 [2]
 18 U.S.C. § 1344 provides:
 Whoever knowingly executes, or attempts to execute, a scheme or artifice--
 (1) to defraud a financial institution; or
 (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years or both.
 
 
 [3]
 Both Culbreath and the government refer in their briefs to 18 drafts sent to Wall during 1990. Exhibit 27 clearly indicates, however, that two of those 18 drafts were sent and returned during 1989
 
 
 [4]
 Those 16 drafts included two that had been paid by Wall and two of the three drafts mentioned in the indictment in this matter