UNITED STATES of America,
Plaintiff–Appellee,

v.

Charles L. WADE, Defendant–
Appellant.

No. 02–3728.

United States Court of Appeals,
Sixth Circuit.

March 31, 2004.

Linda M. Betzer, Asst. U.S. Attorney, U.S. Attorney's Office, Cleveland, OH, for Plaintiff–Appellee.

Gary W. Lanker, Law Office of Gary W. Lanker, Memphis, TN, for Defendant–Appellant.

Before SUHRHEINRICH, CLAY and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.

On February 15, 2002, a jury found Charles Wade guilty of: (1) conspiring to prepare and file false tax returns in violation of 18 U.S.C. § 371; (2) making and subscribing false tax returns in violation of 26 U.S.C. § 7206; (3) aiding, assisting, procuring, counseling and advising in the preparation of false tax returns in violation of 26 U.S.C. § 7206; (4) conspiring to defraud the United States in violation of 18 U.S.C. § 371; (5) committing bank fraud in violation of 18 U.S.C. § 1344; and (6) making, uttering and possessing counterfeit securities in violation of 18 U.S.C. § 513. After determining that Wade also committed perjury during the trial. the district court sentenced him to a 102–month prison term.

In this appeal, Wade argues that the United States violated his Fifth Amendment due process rights by unduly delaying his indictment on the tax counts and that the district court failed to support its perjury determination with adequate evidence. He is mistaken in both respects, and we affirm.

I.

On December 1, 1998, the FBI executed a search warrant at the residence of Charles Wade, seizing counterfeit checks, false identifications, a typewriter and an IBM computer. On April 7, 1999, a grand jury indicted Wade for bank fraud stemming from a counterfeit-check scheme he had run in Youngstown, Ohio between November 1994 and November 1998. A jury eventually found him guilty, and he was sentenced to a 122–month prison term. This Court affirmed his conviction and sentence. *United States v. Wade,* 266 F.3d 574 (6th Cir.2001) (*Wade I* ).

On April 11, 2001, Wade was indicted (along with his two daughters and several other individuals) for his involvement in a second counterfeit-check scheme, which began after November 1998. Also included in this indictment were a number of counts concerning the filing of false tax returns. Wade moved to dismiss the tax counts before trial, claiming that the Government had the evidence necessary to prosecute him on these counts as part of *Wade I* and that the pre-indictment delay violated his due process rights under the Fifth Amendment and his speedy trial rights under the Sixth Amendment. The district court denied Wade's motion. It reasoned that the right to a speedy trial does not attach until an indictment has been filed and that Wade had otherwise failed to show a due process violation. Wade proceeded to trial, and a jury found

him guilty on the tax counts as well as several bank fraud counts.

At sentencing, the district court determined that Wade had committed perjury at trial and applied a two-point enhancement to his base offense level for obstruction of justice. It then sentenced Wade to a 102–month prison term, with twelve months to run concurrently with the *Wade I* sentence, followed by five years of supervisory release.

## II.

On appeal, Wade first asks us to look at the question of pre-indictment delay. According to Wade, he gave three interviews to the IRS–on July 1, 1996, November 4, 1996 and July 21, 1997–all of which "were nothing short of full confessions" concerning the false Form 1040 tax returns. Mem. to Mot. to Dismiss, Aug. 14, 2001 at 1. In view of these interviews, he asserts that the Government had more than enough evidence to initiate a prosecution against him on the tax counts as part of the 1999 *Wade I* indictment and that the two year delay in filing these counts violated his due process rights.

To prevail on such a claim, Wade must prove that (1) his right to a fair trial was substantially prejudiced by the delay, and (2) the Government intentionally caused the delay in order to gain a tactical advantage over him. *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). We review the district court's denial of Wade's motion for abuse of discretion. *See United States v. Overmyer,* 899 F.2d 457, 465 (6th Cir.1990).

## A.

■ Trying to meet these requirements, Wade initially points out "that the government's piecemeal prosecution prejudiced [him] because he was exposed to a more lengthy term of imprisonment due to sentencing compilations." Appellant's Br. at 16. In making this claim. Wade relies heavily on the testimony of Assistant United States Attorney (AUSA) Greg Sasse, a prosecutor in *Wade I,* who felt it was in Wade's best interest to face all of the potential charges at once. AUSA Sasse testified that, prior to the *Wade I* trial, he discussed the possibility of a plea agreement with Wade that would encompass the bank-fraud counts and the developing tax counts. Although the tax counts were not yet ready to be charged, AUSA Sasse believed Wade "would be facing a relatively sure fire conviction [for them] in the future, and [ ] thought it would make sense to combine all of the charges together." Mot. Hr'g Tr. at 72. In his words:

> Sometimes ... when things are charged, piecemeal, you can get base offense levels doubling, and the guideline numbers can actually be higher than if you do it all at once. Also you don't know what you're going to face if it's not being done altogether. And it seem[ed] to make sense for [Wade] to know what he's looking at and be able to make an intelligent decision.

*Id.* at 74–75.

Wade's reliance on AUSA Sasse's testimony to show that his trial was not a fair one suffers from several flaws. While AUSA Sasse may be right that Wade would have benefitted from entering into a plea agreement regarding the charged and uncharged allegations, that does not mean Wade had a right to compel the Government to file charges that were not yet ripe for prosecution. To bring a cognizable due process claim in this area, the pre-indictment delay must prejudice one's right to a fair *trial* –by, for example, causing evidence to become stale or disappear. *See United States v. Rogers,* 118 F.3d 466, 475 (6th Cir.1997) ("The death of a potential

witness during the pre-indictment period may demonstrate the requisite prejudice if the defendant can demonstrate that exculpatory evidence was lost and could not be obtained through other means."). No such evidence was lost or became stale here. And to the extent Wade claims he should have been given a right to plead guilty to all charges at once, AUSA Sasse's testimony shows he was given that right. Wade simply declined to accept a plea on those terms.

Nor may Wade tenably claim that he was denied a fair trial because he had to defend himself in two trials against two sets of claims. That fact by itself does not show an unfair trial. *See United States v. Marshall,* 513 F.2d 274, 276 (5th Cir.1975) ("[A] single trial ... may be a desirable prosecutorial aim ..., but it is not a constitutional imperative."); *see also United States v. Pungitore,* 910 F.2d 1084, 1111 (3d Cir.1990) ("We acknowledge that successive prosecutions may work hardship on the defendant. Also, from the standpoint of judicial economy, it is preferable for the government to consolidate all charges in a single indictment. However, we are not prepared to say that it was a violation of ... due process rights for the government to charge the offenses in the manner it did."); *United States v. Cardall,* 885 F.2d 656, 666 (10th Cir.1989) ("Prosecutors have traditionally enjoyed discretion in deciding which of multiple possible charges against a defendant are to be prosecuted or whether they are all to be prosecuted at the same time."). At all events, the argument is inapplicable here. Because Wade commenced a second counterfeit-check scheme after the first one had ended, he was destined for a second trial either way.

## B.

▮ Wade also fails to satisfy the second prong of the test–that the Government intentionally caused the delay for strategic reasons. *See Marion,* 404 U.S. at 324, 92 S.Ct. 455. Wade contends that "the United States has given numerous excuses but no legitimate investigative justification" for the alleged delay. Appellant's Br. at 18. Wade faces a high hurdle in proving this point. "[A] due process claim of excessive preindictment delay will fail unless the petitioner can show that the government had no valid reason for the delay or that some tactical advantage was sought to be obtained by the delay." *United States v. DeClue,* 899 F.2d 1465, 1468–69 (6th Cir. 1990).

In this instance, the Wade matter was referred to the IRS Criminal Investigation Office in Youngstown, Ohio in August 1995. An initial investigatory process–including background checks, surveillance and interviews of those who filed the false tax returns–took several months to complete. While Wade confessed to his involvement in the tax-fraud scheme in multiple interviews, the IRS sought to corroborate his statements and sent handwriting samples to the IRS forensics lab in Chicago to determine who prepared the false tax returns. Those results were not available until August 1998. At that point, in contrast to the bank-fraud counts, the Government still needed formal approval from the Department of Justice before the tax prosecution could proceed. The Department of Justice ultimately approved the case for prosecution in 2000, a delay that the Government partly attributes to the formal-clearance process and partly to reassignments of IRS Special Agents to the case, as well as health issues faced by AUSA Sasse.

In response to this chronology and to these explanations, Wade points out that AUSA Sasse discussed with him the possibility of a plea bargain (before *Wade I* ) on both the bank fraud charges and the devel-

oping tax counts, because (in AUSA Sasse's words) "if [he was] willing to work out a plea agreement to both the counterfeit check charges and the IRS charges, we could probably do that because the IRS had expedited procedures." The possibility of obtaining approval for a plea agreement that would have encompassed the tax charges, Wade suggests, proves that the tax-count indictment could have been filed earlier and that the later filing of the indictment was simply punishment for not agreeing to a global plea agreement.

The district court had ample reasons to reject this theory. AUSA Sasse testified that in 1999 he "wanted to get.[Wade] off the street now" in view of the seriousness of the bank fraud charges. Mot. Hr'g Tr. at 70. That he offered Wade a plea agreement covering the bank fraud and tax fraud charges is not inconsistent with the Government's claim that it was not then prepared to file and prosecute the charges in the normal course. Indeed, a desire to force a plea agreement from Wade on both sets of charges would have been more fruitfully advanced by filing the indictment on the tax count charges immediately. Nor, it seems, would most criminal defendants relish the precipitous filing of criminal charges in circumstances like these. Some investigations presumably do not end in an indictment. As we noted in *United States v. Greene*, 737 F.2d 572 (6th Cir.1984): " 'Insisting on immediate prosecution once sufficient evidence is developed to obtain a conviction, would pressure prosecutors into resolving doubtful cases in favor of early–and possibly unwarranted–prosecutions.' " *Id.* at 575 (quoting *United States v. Lovasco*, 431 U.S. 783, 793, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)). What is more,

'if courts were required to decide in every case when the prosecution should have commenced, it would be necessary for them to trace the day-by-day prog-

ress of each investigation. Maintaining daily records would impose an administrative burden on prosecutors, and reviewing them would place an even greater burden on the courts.'

*Id.* (quoting *Lovasco*, 431 U.S. at 793 n. 14, 97 S.Ct. 2044). All things considered, the district court did not abuse its discretion in rejecting this claim and most notably in determining that Wade had not shown "that the government had no valid reason for the delay." *DeClue*, 899 F.2d at 1468.

## III.

■ Wade next claims that the district court erred in giving him a two-point sentencing enhancement for obstruction of justice. We disagree.

At trial in *Wade II*, Wade testified that he never gave counterfeit checks to, or received money from, individuals who testified earlier in.the trial. At sentencing, in the aftermath of this testimony, the district court invoked Sentencing Guideline § 3C1.1, which mandates a two-level enhancement if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense." The commentary to this Section specifically indicates that it covers perjury. *See* U.S.S.G. § 3C1.1 cmt. n.4.

A witness perjures himself if he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). When making perjury findings, this court asks district courts to (1) "identify those particular portions of the defendant's testimony that [they] consider[ ] to be perjurious," and (2) " 'either make specific findings for

each element of perjury or at least make a finding that encompasses all of the factual predicates for a finding of perjury.'" *United States v. Mise,* 240 F.3d 527, 531 (6th Cir.2001) (quoting *United States v. Sassanelli,* 118 F.3d 495, 501 (6th Cir. 1997)). In reviewing a district court's decision to impose a § 3C1.1 enhancement, we follow a three-step process:

> First, we review the district court's finding of facts underlying the enhancement for clear error. Next, the district court's conclusion that a given set of facts constitutes obstruction of justice is a mixed question of law and fact which we review de novo. Finally, once the district court has determined that the defendant has obstructed justice, the application of the two level enhancement is mandatory and we review the enhancement de novo.

*United States v. Chance,* 306 F.3d 356, 389 (6th Cir.2002) (citation omitted).

At Wade's sentencing hearing, the district court initially had this to say about Wade's false testimony:

> I do, however, believe that the defendant's statements in his Wade 2 trial indicating that he had nothing to do with any computer-printed or counterfeit checks after a 1998 raid on his house, and that he never gave any check paper to any of the individuals who testified in the first trial, and did not receive any money from any of the individuals who testified in the first trial, the Court finds that those statements do constitute perjury.

Sent. Hr'g Tr. at 99.

Nor did this conclusion stem solely from the fact that Wade testified and was convicted–an approach to perjury determinations that the United States Supreme Court and this Court have condemned. *See Dunnigan,* 507 U.S. at 96–97, 113 S.Ct. 1111 ("The concern that courts will enhance sentences as a matter of course whenever the accused takes the stand and is found guilty is dispelled by our earlier explanation that if an accused challenges a sentence increase based on perjured testimony, the trial court must make findings to support all the elements of a perjury violation in a specific case."); *United States v. Lawrence,* 308 F.3d 623, 632 (6th Cir.2002) ("[T]hough a defendant's right to testify at trial does not include a right to commit perjury, a defendant who is found guilty must not be penalized by an enhancement under § 3C1.1 simply for having testified on his or her own behalf."). The district court showed appropriate sensitivity to this risk:

> I do not premise this solely on the conclusion that the jury found beyond a reasonable doubt that the Defendant in fact did these things, though that's certainly not irrelevant. Instead, the Court premises this conclusion on its own assessment of the testimony of all of the witnesses who appeared in this case and of the strength and credibility of the Defendant's own testimony at the time he testified to these facts.

Sent. Hr'g Tr. at 99.

Wade nonetheless claims that the district court never explained how this testimony was material in the instant case and that there was no factual predicate for the court's finding of perjury. But, as we noted in *Mise,* a district court may "either make specific findings for each element of perjury *or* at least make a finding that encompasses all of the factual predicates for a finding of perjury." 240 F.3d at 531 (emphasis added). By identifying misstatements that related directly to Wade's guilt (or innocence) with regard to the bank fraud charges, the district court's finding encompassed the necessary predicates for a perjury determination, materiality included.

Even if that were not the case, the alleged flaw is harmless. *See United States v. Patrick,* 988 F.2d 641, 647–48 (6th Cir.1993) ("[W]e agree that improprieties on the part of sentencing judges are subject to review under the harmless error rule."). Whether Wade provided counterfeit checks to anyone after the 1998 raid on his house and gave check paper to, or received money back from, witnesses testifying in *Wade II* bears directly on whether he committed bank fraud. *See* U.S.S.G. § 3C1.1 cmt. n.6 ("[A] '[m]aterial' ... statement ... as used in this section, means [a] statement ... that, if believed, would tend to influence or affect the issue under determination."). By denying his involvement in these activities, Wade tried to contradict the Government's claim that he committed bank fraud in the instant case. The false statements are plainly material, and accordingly the alleged error (even if it did exist) would be harmless.

Lastly, Wade argues that the district court erred in claiming he gave check paper to, or received money back from, individuals who testified in his *first trial.* But this argument simply misapprehends the court's statement. Nothing in the sentencing transcript indicates that *Wade I* was ever discussed, and it is clear from the district court's colloquy at sentencing that it was differentiating between witness testimony at trial in February 2002 and testimony given at sentencing in June 2002. No error occurred.

## IV.

For the foregoing reasons, we affirm.